**In the Matter of BOSTON AND MAINE CORPORATION, Debtor.**

No. 70–250–M.

United States District Court,
D. Massachusetts.

March 12, 1979.

---

Charles W. Mulcahy, Jr., Mulcahy and Mulcahy and Robert M. Gargill, Choate, Hall & Stewart, Boston, Mass., for trustees.

Joseph H. B. Edwards, Paul J. Lambert, Diane M. Kottmyer, Bingham, Dana & Gould, Boston, Mass., for first mortg. indenture trustees.

Paul B. Galvani, Ropes & Gray, Boston, Mass., for Maine Cent. R. Co. and the Portland Terminal Co.

John T. Collins, Sherburne, Powers & Needham, Boston, Mass., for the Chesapeake & Ohio Ry. Co., the Baltimore & Ohio R. Co., and Western Maryland Ry.

William P. Quinn, Fell, Spalding, Goff & Rubin, Philadelphia, Pa., for Trailer Train Co.

William R. Glendon, Donald F. Luke, Rogers & Wells, New York City, and W. Charles Hogg, Jr., Edward C. Toole, Jr., Stephen W. Miller, Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for the Committee of Interline Railroads.

William Humphrey Tucker, Boston, Mass., for trustees of the property of Penn Central Transp. Co., debtor.

Philip Burling, Foley, Hoag & Eliot and John J. Glessner, III, Boston, Mass., for Eastern Associated Coal Co.

George W. McLaughlin, Boston, Mass., for Canadian Pac. Railroad.

John T. Daley, Dane, Howe & Brown, Boston, Mass., for Exxon Corp.

Francis J. Robertson, pro se.

Sunshine & Sunshine, P. C., New York City, for Uniroyal, Inc.

Donald R. Bryant, Burns, Bryant, Hinchey, Cox & Shea, Dover, N. H., for Town of Madbury, N. H.

Joseph D. S. Hinkley, Peabody & Arnold, Boston, Mass., for the second mortgage trustee.

John H. Broadley, Dept. of Justice, Washington, D. C., for the U. S.

## MEMORANDUM

FRANK J. MURRAY, Senior District Judge.

The Debtor's Trustees have petitioned the court to fix the division of creditors and stockholders in the reorganization proceedings according to the nature of their respective claims and interests, pursuant to Section 77(c)(7) of the Bankruptcy Act (the Act), 11 U.S.C. § 205(c)(7). The Trustees suggested an order of priorities of creditors and stockholders divided into eleven categories, to which objections were filed. The petition and objections came on to be heard by the court, after notice to the Interstate Commerce Commission (ICC) and to all creditors and stockholders, on the several stipulations of the Trustees and certain creditors, the briefs filed by the Trustees and certain objectors, and the oral arguments on behalf of the Trustees and certain creditors.

### I. Per diem claims

■ Thirty-eight railroads [1] and Trailer Train Company (collectively the "interline claimants") object to the classification by the Trustees of their pre-reorganization per diem charges against the Debtor in a category subordinate to the holders of general unsecured claims. The interline claimants seek to have the court establish them as a separate class of creditors with respect to these per diem charges at a high-level priority, or at the very least at priorities under the "six months rule" or "necessity of pay-

ment rule". Earlier in the reorganization proceedings against the Debtor the question whether these per diem charges were entitled to priority over the claims of other creditors was raised when the interline claimants sought an order requiring the Trustees to make immediate payment of such charges. This court declined to follow the decision In the Matter of Chicago, R. I. & P. R. Co., 537 F.2d 906 (7th Cir. 1976), cert. denied 429 U.S. 1092, 97 S.Ct. 1102, 51 L.Ed.2d 537 (1977) (Rock Island) on the priority issue, and denied the interline claimants' petitions. In the Matter of Boston and Maine Corporation, Debtor, 456 F.Supp. 412 (D.Mass.1978). On the instant petition the interline claimants have again urged certain contentions which they raised in the earlier proceedings. Ordinarily, consideration of the same arguments would not be entertained. However, because the court is now called upon for the first time to undertake its statutory duty under section 77(c)(7) to fix the division of creditors and stockholders "for the purposes of the plan [of reorganization] and its acceptance", id., it will not foreclose reconsideration of the arguments.

### Interline claimants are not entitled to special priority

■ Pre-reorganization per diem charges are part of the operating expenses of the railroad, are unsecured debts within the meaning of the Bankruptcy Act [11 U.S.C. §§ 1(14), 205(b)], and are entitled to no designated preferred priority among the debts of the railroad in reorganization. Neither the Bankruptcy Act nor the Interstate Commerce Act, 49 U.S.C. § 1 et seq., specifically provides for priority status of per diem claims over claims of other creditors.[2] There is no explicit general order of

---

1. The railroads are: Baltimore And Ohio R. Co., Chesapeake And Ohio R. Co., Western Maryland Ry., Maine Central R. Co., Canadian Pacific R. Co., and the Committee of Interline Railroads which represents 34 railroads.

2. This is particularly significant in light of the specific priority given certain claims in section 77. See 11 U.S.C. § 205(n) (claims of employ-

ees for personal injuries; claims of sureties on certain bonds); 11 U.S.C. § 205(c)(3) (claims under trustees' certificates); 11 U.S.C. § 205(b) (unsecured claims under the "six months rule"). See In re Chicago Express, Inc., 222 F.Supp. 566, 571 (S.D.N.Y.1963), aff'd 332 F.2d 276 (2d Cir. 1964), cert. denied 379 U.S. 879, 85 S.Ct. 146, 13 L.Ed.2d 86 (1964), where the court said: "Where Congress intended that special

the ICC directing the trustee of a railroad in reorganization to pay pre-reorganization per diem charges; there is no specific order of the ICC requiring the Trustees of this Debtor to pay such charges. There has been no demonstration that the interline carriers, some of them competitors of the Debtor, conferred on the Debtor such special benefits by the services for which the per diem charges were made as to equitably entitle them to a preference over all other creditors. The view of the Third Circuit that with respect to pre-reorganization per diem charges interline claimants are entitled to no higher priority than other unpaid suppliers of goods and services delivered prior to the filing of the petition in reorganization, *In re Penn Central Transportation Company*, 486 F.2d 519, 528 (3rd Cir. 1973), *cert. denied* 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974); *Matter of Penn Central Transportation Company*, 553 F.2d 12, 15 (3rd Cir. 1977), correctly appraises the interests of the interline claimants in relation to other creditors.

Relying on *Rock Island* the interline claimants contend, however, that because of the mandatory nature of certain ICC orders prescribing per diem rates and rules for the settlement of per diem accounts, the court must distinguish between the asserted singular nature of their per diem charges and claims of other creditors in any priority classification of creditors. As previously pointed out in this memorandum, this court declined to follow *Rock Island* on the priority issue, and there is nothing in the presentations made on the instant petition to persuade the court to change its views (1) that the rationale of *Rock Island* does not support a preferred priority status for per diem charges of approximately $8,018,000 for services performed before August 1, 1969, and (2) that to accord preferred priority to per diem charges of approximately $564,000 for pre-reorganization services rendered after August 1, 1969 would result, in the absence of clear and specific statutory authority and policy, in insulating interline carriers as creditors from the strictures of section 77 contrary to the intent of Congress.[3]

Any consideration of the extensive powers of the reorganization court under section 77 to control and adjust the claims of creditors must take account of the traditional bankruptcy goals of that section: rehabilitation of the debtor and equitable distribution of the debtor's property to creditors. *See New Haven Inclusion Cases*, 399 U.S. 392, 420, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970). By the terms of section 77(c)(7), the traditional bankruptcy function of establishing priorities among creditors is exclusively that of the reorganization court, and not a function of the ICC.[4] Thus, the contention that the court's power to determine the priority of distribution of the property of a debtor in reorganization to a class of interline creditors in relation to the claims of other creditors has been circumscribed by

---

priorities be granted 'it has carefully enumerated them, and any omissions must be construed as express exclusions . . .'". (Citations omitted.)

**3.** It is undisputed that the Debtor's Trustees have paid all per diem charges at the ICC prescribed rates for car use furnished *after* the Trustees had assumed control over railroad operations. Such action complies with their duty under section 77(c)(2) to operate the business of the Debtor "subject to the control of the judge and the jurisdiction of the Commission". However, the language of section 77(c)(2) cannot be read to displace the power of the court to determine the rights and liabilities of creditors, including interline creditors, for services rendered *before* the Trustees assumed control over railroad's operations. Neither can section 77(c)(2) be read to mandate retrospective application to pre-reorganization operations of the Trustees' "power to operate the business of the debtor". *Id.*

**4.** Section 77(c)(7) must be considered with other provisions of section 77 particularly section 77(e) which provides that the reorganization court

. . . shall approve the plan if satisfied that: (1) It . . . is fair and equitable, affords due recognition to the rights of each class of creditors and stockholders, does not discriminate unfairly in favor of any class of creditors or stockholders, and will conform to the requirements of the law of the land regarding the participation of the various classes of creditors and stockholders; . . .

the superseding authority of ICC, carries a very heavy burden of persuasion. That burden has not been met by the interline claimants; with respect, the court declines to follow the reasoning of the *Rock Island* court on the issue. Rather, the court concludes that proper consideration of the clear and specific applicable provisions of section 77, and its underlying policies, requires the ruling that the court is vested with the authority to determine the claims for special priority of pre-reorganization per diem charges and the classification of the interline claimants. Accordingly, for the reasons stated, the court determines that the interline claimants are not a special class of creditors entitled to special priority.

## II. *Six Months Rule*

The interline claimants and certain other creditors [5] holding unsecured claims seek to have their claims approximating $3,000,000 accorded special priority under the so-called "six months rule". Debtor's Trustees contend that establishment of a separate class of creditors to be accorded priority as "six months creditors" is not justified under the circumstances of the case. In general, the parties are in agreement as to the origin of the rule and its elements; they do not entirely agree as to its intended application. They agree that it was made applicable to railroad reorganization proceedings by section 77(b), which provides in pertinent part:

. . . unsecured claims, which would have been entitled to priority if a receiver in equity of the property of the debtor had been appointed by a Federal court on the day of the approval of the petition, shall be entitled to such priority and the holders of such claims shall be treated as a separate class or classes of creditors.

The rule was first enunciated in *Fosdick v. Schall*, 99 U.S. 235, 25 L.Ed. 339 (1879). Since that time the rule has been applied in numerous cases, resulting in many inconsistencies among the decisions of courts below the Supreme Court. *Compare, e. g., In the Matter of Penn Central Transp. Co.*, 458 F.Supp. 1234 (E.D.Pa.1978) (*"Penn Central"*) and *In the Matter of New York, New Haven and Hartford R. Co.*, 278 F.Supp. 592 (D.Conn.1967) (*"New Haven"*) *aff'd*, 405 F.2d 50 (2d Cir. 1968), *cert. denied*, 394 U.S. 999, 89 S.Ct. 1592, 22 L.Ed.2d 776 (1969) with *Southern Ry. v. Flournoy*, 301 F.2d 847 (4th Cir. 1962). Because its application depends upon the facts peculiar to each case, *Southern Ry. Co. v. Carnegie Steel Co.*, 176 U.S. 257, 20 S.Ct. 347, 44 L.Ed. 458 (1900), the rationale of the rule is most important. In *Fosdick* the Court said:

[W]hen companies become pecuniarily embarrassed, it frequently happens that debts for labor, supplies, equipment and improvements are permitted to accumulate, in order that bonded interest may be paid and a disastrous foreclosure postponed, if not altogether avoided. In this way the daily and monthly earnings, which ordinarily should go to pay the daily and monthly expenses, are kept from those to whom in equity they belong, and used to pay the mortgage debt. The income out of which the mortgagee is to be paid is the net income obtained by deducting from the gross earnings what is required for necessary operating and managing expenses, proper equipment and useful improvements. Every railroad mortgagee in accepting his security impliedly agrees that the current debts made in the ordinary course of business shall be paid from the current receipts before he has any claim upon the income. If for the convenience of the moment something is taken from what may not improperly be called the current debt fund, and put into that which belongs to the mortgage creditors, it certainly is not inequitable for the court, when asked by the mortgagees to take possession of the future income and hold it for their benefit, to require as a condition of such an order that what is due from the earnings to the current debt shall be paid by the court from the future current receipts

---

5. The other creditors are Eastern Associated Coal Corporation, Exxon Corporation, Uniroyal Inc., and Francis J. Robertson.

before anything derived from that source goes to the mortgagees.

99 U.S. 252–53.

■ To qualify under the rule a creditor must establish (1) that the claim represents a current operating expense of the railroad necessarily incurred, (2) that it was incurred within six months prior to the filing of the reorganization petition, and (3) that the goods or services were delivered on credit with the expectation that the debt would be paid out of the current operating revenues of the railroad, and not in reliance on the railroad's general credit. *Penn Central, supra* at 1321. However, it must also be proved, before any right to priority under the rule can be established, that a "current debt fund" (also sometimes referred to as a "current expense fund") exists, or should equitably be re-created, out of which priority payments can be made. *Id.* The question whether such fund exists or should be re-created is the principal point of dispute between the Trustees and the creditors, and is the sole issue to be determined with reference to the six months rule on this petition.

■ Before addressing the issue of the "current debt fund", certain general principles concerning the applicability of the rule should be noted. The rights of qualified six months creditors are superior to the rights of the mortgagees in the current operating revenues of the railroad. *Fosdick v. Schall, supra* 99 U.S. at 252–53. Six months creditors have no rights in the "corpus" of the debtor's estate except to the extent that current revenues have been improperly diverted for the benefit of the mortgagees. *Id.* at 254; *New Haven, supra* at 602; *Penn Central, supra* at 1321. The priority of qualified six months creditors is superior to the claims of pre-bankruptcy secured creditors, *New Haven, supra* at 597–98, but not to the claims of administration expenses incurred during the reorganization period. *Penn Central, supra* at 1321. The trustee of a railroad in reorganization is responsible only for funds coming into his hands, and he cannot be required to recover payments made by the railroad before bankruptcy of

non-operating current debts. *See Penn Central, supra* at 1321.

## Current Debt Fund

■ The existence of the current debt fund is to be determined as of the date of distribution of the debtor's estate, with the relevant period beginning six months before the reorganization petition was filed and including the reorganization period. *Penn Central, supra* at 1323; *accord, New Haven, supra* at 600. Hence, a classification determination made prior to distribution may be subject to later revision if circumstances change.

The six months rule does not operate to impress an equitable lien upon operating revenues, or upon net income, received during the six months period, or at some later point of time before the date of distribution, as earmarking the current debt fund. The rule stems from the familiar rule of courts of equity when administering a fund or property in the hands of its officer—receiver or trustee—and applies when making disposition of the earnings of property in the custody of the court. *See Fosdick, supra; see also In re Chicago Express, Inc.,* 332 F.2d 276, 278 (2d Cir. 1964). The Trustees argue that *New Haven* should be followed, with certain modifications, as to possible sources of the current debt fund. In *New Haven* Judge Anderson pointed out that

[s]uch a fund may arise out of one or more of the following: (a) current earnings in the sense of surplus earnings during the six months period and during the reorganization itself; (b) unmortgaged assets of the debtor; and (c) income diverted during the six months period or during the reorganization for the benefit of the mortgagees.

278 F.Supp. at 598. The same formulation was adopted by Judge Fullam in *Penn Central,* with some doubt expressed by him as to the propriety of inclusion of unmortgaged assets. The interline claimants contend that this formulation is not in accord with *Fosdick* and other Supreme Court cases and, therefore, should not be followed.

### 1. *The revenue element*

The objecting creditors argue that contrary to *New Haven* and *Penn Central* the source of the revenue element of the current debt fund is the railroad's "current receipts". In their memorandum of law the interline claimants say, at page 19: "The current debt fund, as identified and defined in *Fosdick* . . . and other Supreme Court cases, is a very simple concept: The fund is a company's current receipts". However, they do not identify in the evidence what they refer to as the "current receipts" of the Debtor here. They avoid explicitly identifying "current receipts" with the Debtor's "gross operating revenues". What they have done is to direct the court's attention to the gross operating revenues of the Debtor of $34,047,000 for the six months prior to March 12, 1970, and of $713,535,000 through July 13, 1978, and argue from these amounts that "[t]here were, thus, ample current receipts available during the six months period in a 'current debt fund' to pay six months operating creditors". Memorandum . . . of Interline Railroads, p. 22.

This oversimplification does not purport to demonstrate that any of the receipts realized during the six months period were "kept from those to whom in equity they belong, and used to pay the mortgage debt". *Fosdick, supra* 99 U.S. at 253. The argument focuses merely on the phrase "current receipts" and ignores the rationale of the rule. It fails to consider whether any funds came into the hands of the Trustees when they were appointed, and fails to take into account what uses were made of the gross operating revenues during the six months period. The determination whether a current debt fund exists or should be re-created involves an inquiry into the debtor's operations much beyond the mere observation that indeed there were current receipts because there were gross operating revenues. The court rejects, as either un-

clear or a misconstruction of the phrase "current receipts," the argument of the interline claimants that the current debt fund is merely the "current receipts". Rather, the court will adopt, with perhaps some reservation at this juncture, the definition in *New Haven* as follows:

> The current expense fund available from earnings can be defined . . . as the sum of all operating revenues which have accrued during the six months period and in the course of reorganization, and which have actually been received or taken over by the Trustees, less depreciation and all operating expenses which have actually been paid or are payable by the Trustees or which constitute administration expenses.

278 F.Supp. at 599.

In affirming *New Haven*, the Second Circuit Court of Appeals stated:

> We hold that the availability of a current expense fund under the six months rule is to be determined by generally accepted accounting practices, including those prescribed by the Interstate Commerce Commission, and that under those practices the current expense fund is to be computed by deducting operating expenses and depreciation from operating revenues.

*In re N.Y., N.H. & Hartford R.R. Co.*, 405 F.2d 50, 52 (2d Cir. 1968), *cert. denied*, 394 U.S. 999, 89 S.Ct. 1592, 22 L.Ed.2d 776 (1969).

The evidence here clearly demonstrates that there is no basis for finding the existence of a current expense fund from the operating revenues. No surplus revenues accrued in the six months period and during the course of reorganization.[6] The current liabilities of the railroad of $30,929,401 exceeded the current assets of $14,704,246 by approximately $16,000,000 when the Trustees assumed control on March 12, 1970. The railroad incurred a net loss from rail-

---

**6.** During the period September 13, 1969 through December 31, 1977, gross operating revenues of the Debtor totalled $696,552,000, and gross operating expenses, including a depreciation allowance of $33,212,000, totalled $739,055,000. These figures, and the figures used in the analysis of the evidence which follows are taken from the Debtor's schedules filed with the ICC.

way operations during the six months period of $3,588,000, and if non-operating net income realized during this period were added, there still was a net loss of $3,441,000. There has been no showing that there is presently a surplus of operating income in the hands of the Trustees. During the entire period from six months prior to the filing of the petition on March 12, 1970 until July 31, 1978 there was a net loss from railway operations of $40,720,000, and a deficit in income available for fixed charges of about $29,407,000. Whether any of the operating revenues were "kept from those to whom in equity they belong" remains to be considered.

### 2. *Diversion for benefit of mortgagees*

■ Where the Trustees do not possess surplus earnings in their hands to satisfy six months creditors' claims, the court may look to the corpus of the estate for any income diverted during the relevant period for the benefit of the mortgagees. *See Fosdick, supra* 99 U.S. at 254. Supreme Court cases and other federal cases hold that an invasion of the corpus of the estate for this purpose is permissible only to the extent that the current debt fund has been diverted to the benefit of mortgagees. *See, e. g., Fosdick, supra* 99 U.S. at 254:

> [If] it appears in the progress of the cause that bonded interest has been paid, additional equipment provided, or lasting and valuable improvements made out of earnings which ought in equity to have been employed to keep down debts for labor, supplies and the like, it is within the power of the court to use the income . . . to discharge obligations which, but for the diversion of funds, would have been paid in the ordinary course of business.
>
> . . .
>
> \*     \*     \*     \*     \*     \*
>
> Whatever is done [by the court] must be with a view to a restoration by the mortgage creditors of that which they have thus inequitably obtained. It follows that if there has been in reality no diversion, there can be no restoration; and that the amount of restoration should be made to depend upon the amount of diversion. (underscoring added)

*See also St. Louis, A. & T. H. R.R. Co. v. Cleveland, C., C. & I. R. Co.,* 125 U.S. 658, 674, 8 S.Ct. 1011, 31 L.Ed.2d 832 (1888); *Gregg v. Metropolitan Trust Co.,* 197 U.S. 183, 187, 25 S.Ct. 415, 49 L.Ed. 717 (1905); *New Haven, supra* 278 F.Supp. at 602; *Penn Central, supra* at 82.

There is some opinion to the contrary, *see, e. g., Southern Railway Co. v. Flournoy,* 301 F.2d 847 (4th Cir. 1962); *In re Tennessee Central Ry. Co.,* 316 F.Supp. 1103, 1111–12 (M.D.Tenn.1970). However, the better view and the weight of authority clearly require the showing of a diversion of income for the benefit of the mortgagees before invasion of the corpus for the benefit of six months' creditors will be permitted. In *Johnson Fare Box Company v. Doyle,* 250 F.2d 656, 657 (2d Cir. 1958), *cert. denied* 357 U.S. 938, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958), the court emphasized that:

> The so-called six months' priority rule is an invasion of the established contract rights of lienholders. As an invasion the rule should be strictly contained within narrow confines and limited to the purposes which brought it into being.

Plainly the rationale of the rule requires, contrary to the view expressed in *Flournoy,* that income diversion to the mortgagees be "the sine qua non of corpus invasion". 301 F.2d at 851.

The cases have held that payments out of income, that should have gone into the current debt fund, made for the benefit of the mortgagees such as payments for principal and interest, *Fosdick, supra,* 99 U.S. at 253, increments in the mortgage security, *New Haven, supra* 278 F.Supp. at 603, capital improvements to mortgaged property, *Fosdick, supra* 99 U.S. at 253, *Southern Ry. Co. v. Carnegie Steel Co.,* 176 U.S. 295, 20 S.Ct. 347, 44 L.Ed. 458 (1900), new acquisitions of property which became subject to the mortgage, *Gregg v. Metropolitan Trust Co.,* 124 F. 721, 722 (6th Cir. 1903), *aff'd* 197 U.S. 183, 25 S.Ct. 415, 49 L.Ed. 717 (1905), and, under certain circumstances, payments of equipment trust obligations, *see Southern Railway Co. v. Carnegie Steel Co., supra*

*and New Haven, supra* 278 F.Supp. at 603, constitute diversions.

■ The objecting creditors contend that substantial diversions occurred before and after March 12, 1970, and, accordingly, that the six months creditors are entitled to preferential payment at least to the extent of the alleged diversions. The interline claimants argue that these diversions may be shown in the table set out in the footnote.[7] But it is not enough merely to show expenditures for obligations or acquisitions of property that indeed have the appearance of diversions; it must also be proved that the expenditures were made out of funds "kept from those to whom in equity they belong, and used to pay the mortgage debt". *Fosdick, supra 99 U.S. at 253.*

The Trustees present a two-pronged argument that no diversions for the benefit of secured creditors occurred.[8]

*a.*

In the first phase of their argument they stress, in effect, that contributions were made to the income fund from sources other than income from operations, and that such contributions must be considered as a reimbursement pro tanto on account of payments of pre-reorganization secured obligations and for improvements to pre-reorganization mortgaged property. They also argue that payment of Equipment Trust # 1, a pre-reorganization secured obligation, resulted in the acquisition of property unencumbered by pre-reorganization mortgage security interest. The Trustees' computation submitted in response to the court's order of February 5 shows that total payments of $7,648,000 of pre-reorganization secured obligations and for improvements to mortgaged property were paid in part from the proceeds of the sale of mortgaged property in the sum of $2,244,000. The Trustees argue that the remainder of $5,404,000 is more than offset by contributions to operating income from the proceeds of the sales of mortgaged property of $3,079,000, and of scrap of mortgaged property of $2,583,000.

---

7. The interline claimants contend the items appearing below are shown in Schedule 1 to Exhibit A to the Trustees' answers to interrogatories. It should be noted however that the amount of item 15 in Schedule 1 is $2,600,000, and not $2,590,000 as appears below. It should also be noted that the actual total of the items is $16,332,000, not $14,960,000, as shown below.

Items

| 12. | Payment to mortgagees: | |
| | Pre-petition (principal and interest) | $    92,000. |
| 14. | Conditional sales contract payments: | |
| | Pre-petition (principal and interest) | 675,000. |
| 15. | Equipment trust payments: | |
| | Principal and interest | 2,590,000. |
| 17. | Capital expenditures (less amount financed): | |
| | Equipment and tangible personal property | 10,862,000. |
| | Improvements | 2,013,000. |
| | Total | $14,960,000. |

With reference to item 17, the evidence does not show whether the equipment and tangible personal property were additions, betterments or improvements to mortgaged property. Because "ambiguities must generally be resolved against those claiming benefit of the rule", *In the Matter of New York, New Haven and Hartford R. Co.*, 278 F.Supp. 592, 596 (D.Conn.1967) ("New Haven"), *aff'd*, 405 F.2d 50 (2d Cir. 1968), *cert. denied*, 394 U.S. 999, 89 S.Ct. 1592, 22 L.Ed.2d 776 (1969), there can be no presumption that the equipment and tangible personal property effected increments to the mortgage security.

8. "The total of all payments of pre-reorganization secured obligations and for improvements to property subject to pre-organization mortgages exclusive of such payments made with the proceeds of sale of mortgaged assets and payments which resulted in the acquisition of property unencumbered by pre-reorganization mortgages and security interest—that sum is less than the sum of proceeds of sales of mortgage property and of scrap of mortgage property used to pay operating expenses.

"All of this is wholly without reference to the impact of depreciation. The Trustees . . . submit that so long as the sum of all payments of pre-reorganization secured obligations and additions, betterments and improvements to mortgaged property is less than depreciation, there can be no inequitable diversion in favor of secured creditors which requires the re-creation of a fund for payment of a six month priority."

"Trustees' Brief . . . Order No. 398" at 22–23.

The $2,583,000 were contributed to operating income generally for operating expenses. The $3,079,000 proceeds were paid to settle property taxes outstanding on March 12, 1970.[9] Thus these contributions totalling $5,662,000 may be considered as reimbursement pro tanto to replace revenues used for the payments of secured obligations. *See Central Trust Co. of New York v. East Tennessee V. & G. R.R. Co.*, 80 F. 624, 625–26 (6th Cir. 1897). These payments from the proceeds of the sales of mortgaged property were made out of what were referred to in *New Haven, supra* at 603, as "free funds", and not out of earnings.

The Trustees' argument that payment of Equipment Trust # 1 of $2,600,000 should be an additional offset against the total payment of $7,648,000 because the property acquired is unencumbered, is not persuasive. The parties have not agreed that the acquisition is unencumbered property, and because its status as such is, at best, in doubt, the court has not considered the value of the acquisition an offset to pre-reorganization obligation payments. However, with the $2,600,000 item excluded as an offset it has been demonstrated nevertheless that no diversion for the benefit of the mortgagees occurred as a result of the payments referred to.

### b.

The second prong of the Trustees' argument is that no diversions occurred because the depreciation allowance in the income account under the ICC reporting system exceeds the aggregate of all payments made on pre-reorganization secured obligations and for increments to mortgaged property. The depreciation allowance in the income account (Schedule 1 of Exhibit A, item 11) is $33,212,000, an amount in excess of the sum of $5,635,000 (payments out of operating income made on pre-reorganization secured obligations) and $12,875,000 (capital expenditures for equipment and tangible personal property and improvements, Schedule 1 of Exhibit A, item 17).[10] It is the contention of the interline claimants that "depreciation is irrelevant to the rule", and that in any event because depreciation is an accounting concept "there is no reason to believe that it necessarily reflects the amount of any real deterioration in the value of the equipment involved". Interline Claimants' Brief at 27. In *New Haven* the court pointed out that

> [depreciation] is a reflection of the very real economic fact that the assets are being consumed or wasted away in the process of keeping the railroad running and is actually a measure of the contribution of physical properties made by the mortgagees for this purpose. . . . Allowance of depreciation is comparable to expenditures made merely to preserve and not to increase the mortgaged assets and as such are not diversions.

278 F.Supp. at 604. The court in *Penn Central* adopted the view expressed in *New Haven.* It must be recognized as a matter of common knowledge that the ordinary wear and tear of railroad assets by operations can be foreseen, and such assets will become exhausted unless measures are taken to keep them in repair or replace them. Physical deterioration of railroad property and equipment caused by operations is inevitable; functional depreciation, perhaps, cannot be foreseen with the same degree of accuracy as physical deterioration but it is an economic fact nevertheless. To offset depreciation it is necessary to take care of the property to maintain its efficiency, or to replace property when it is no longer efficient, or to set up new assets or reserves to take the place of the losses caused by wear and tear or functional decline. The use of

---

**9.** Property taxes are railway operating expenses. Exhibit A.

**10.** In footnote 7, *supra*, the court concluded that on the evidence now before the court the equipment and tangible personal property listed in item 17 of Schedule 1 of Exhibit A was not shown to be increments to the mortgage security. Solely for the purpose of analyzing the Trustees' argument on depreciation the court has treated such property as arguably a benefit to secured creditors, without deciding that it is.

revenues to offset depreciation serves the purposes of Section 77 which are, *inter alia*, to conserve the debtor's assets for the benefit of all creditors and to preserve an ongoing railroad in the interest of the public.

■ The court rejects the contentions of the interline claimants, and adopts the view of the *New Haven* and *Penn Central* courts that depreciation does not result in enhancement of the mortgaged assets and is not to be regarded as a diversion.

Analysis of this phase of the Trustees' argument is necessary to determine the effect of the allowance for depreciation on the operating income during the relevant period under the six months rule. It is apparent that certain adjustments should be made to the net railway operating deficit of $42,503,000. Reduction of this deficit by disallowing the capital expenditures for equipment and tangible personal property and improvements, totalling $12,875,000, and the payments of pre-reorganization secured obligations of $5,635,000, will eliminate any expenditures which arguably might have benefitted the mortgagees. There should also be disallowed the $3,000,000 of claims of the six months creditors. These reductions result in an adjusted net railway operating deficit of $20,993,000. If these same items are disallowed in the deficit status of income available for fixed charges of $33,216,000 the result is an adjusted deficit of $14,706,000 in that account. Thus, disallowance of the factors which arguably may aid the claims of the six months creditors still leaves a deficit of operating income and income available for fixed charges, demonstrating that there are no earnings available to re-create a current debt fund.

### 3. Unmortgaged assets

The Trustees claim that they hold certain property unencumbered by the lien of any mortgage. Included in that property are items of cash, accounts receivable, wharf property in Portsmouth, New Hampshire, securities and other assets of leased lines and of subsidiary companies, and investment securities. The Trustees also claim as unencumbered property that which was formerly subject to Equipment Trust #1 and their equity in certain equipment and tangible personal property acquired during the reorganization proceedings. These claims are made by the Trustees with realization that the mortgagees may assert some of this property is subject to mortgage liens.

The court has herein declined to view the value of the Equipment Trust #1 property as an offset to pre-reorganization obligation payments, and, accordingly, will not view it as unmortgaged assets at this stage of the Trustees' argument. Similarly the court pointed out that the creditors have not demonstrated that the equipment and tangible personal property in item 17 of Schedule 1 to Exhibit A, see footnote 7 above, were increments to the mortgage security. The court will not review those rulings here. The "unmortgaged assets" aspect of the case will be considered without reference to either the Equipment Trust #1 property or the equipment and tangible personal property.

The six months claimants have not argued that "unmortgaged assets" should be deemed a source of current debt fund. Although "unmortgaged assets" were discussed in *New Haven* and *Penn Central* as a source of a current debt fund, in neither case did "unmortgaged assets" become an issue. In their respective discussions, those courts were not in agreement as to whether such assets should be included as a source.[11]

■ Recourse to unmortgaged assets as a source of a current debt fund undermines

11. In *New Haven*, use of unmortgaged assets as a source of a current debt fund was based on an earlier Second Circuit decision, *Pennsylvania Steel Co. v. New York City Ry.*, 216 F. 458 (2d Cir. 1914), where, as a matter of public policy, the six months creditors were preferred over other creditors, on the strength of the unmortgaged assets of the railroad, because they (the six months creditors) had supported a financially troubled railroad. Judge Fullam, in *Penn Central*, expressed "great difficulty squaring this reasoning with the fundamental basis for a six months priority, namely, reliance of current operations creditors upon current revenues". 458 F.Supp. 1321, n.81.

the rationale of the six months rule, which is that six months creditors in providing goods and services to the railroad, relied for payment upon the income generated by their contributions to the current operations of the railroad, and not upon the railroad's general credit. *See Fosdick, supra* 99 U.S. at 252–53. In light of the fact that the six months creditors have not asserted a claim against unmortgaged assets as a source of a current debt fund, and because inclusion of unmortgaged assets in such a fund would not represent restoration of funds "kept from those to whom in equity they belong, and used to pay the mortgage debt", *id.*, 99 U.S. at 253, the court will not look to unmortgaged assets of the Debtor, if any, as a source of a current debt fund.

For the foregoing reasons, the court concludes that no current debt fund exists or should in equity be re-created and, therefore, that no separate priority classification for six months creditors should be designated.

### III. *Necessity of Payment Rule*

■ The interline claimants and certain other creditors assert a claim for priority founded upon the so-called "necessity of payment rule". The claims are for per diem charges, private car rentals, car repairs, damaged and destroyed cars, and diesel fuel. The parties have stipulated that no creditor claiming under this rule has insisted on payment of its claim as a condition of its providing goods and services to the Debtor, and that the Trustees have never sought authority from the court under this rule for payment of any such claims.

In *Miltenberger v. Logansport Railway Company*, 106 U.S. 286, 1 S.Ct. 140, 27 L.Ed. 117 (1882), where the rule was first enunciated, the Court held that where payment of

a pre-reorganization claim was necessary for the continued operation of the railroad during reorganization, the court may permit the trustee to pay the claim though it was not entitled to special priority. Justice Holmes pointed out in *Gregg v. Metropolitan Trust Co.*, 197 U.S. 183, 187, 25 S.Ct. 415, 416, 49 L.Ed. 717 (1905), that the "ground of such allowance as was made [in *Miltenberger*] was not merely that the supplies were necessary for the preservation of the road, but that the payment was necessary for the business of the road,—a very different proposition".

The necessity of payment rule is not a rule of priority; it is a rule of payment. "The necessity of payment rule is not based on considerations of equity but is rather a device for handling a threat to the continued operation of the railroad <u>during reorganization</u>. If there is no such threat, the rule is not applicable." *New Haven, supra* at 603, n.15 (underscoring added). Here the evidence and the stipulation demonstrate that the rule is inapplicable, and the claims under the rule must be denied.

### IV. *Objections of the United States*

The United States has asserted non-tax pre-reorganization claims against the Debtor which include Federal Railroad Administration safety claims, United States Department of Agriculture overcharge claims, United States Department of Agriculture loss and damage claims, and Government Accounting Office overcharge and loss and damage claims. Its objection to the Trustees' proposed classification seeks establishment by the court of a separate class for these claims between proposed categories 4 and 5, based upon the provisions of 31 U.S.C. § 191.[12] Although the Trustees in their brief disputed the asserted priority, at the hearing on the petition counsel for the

---

**12.** 31 U.S.C. § 191 provides:

"Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied; and the priority established shall extend as well to cases in which a debtor, not having sufficient property to pay all his debts, makes a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed, or absent debtor are attached by process of law, as to cases in which an act of bankruptcy is committed."

Trustees withdrew the objection to the claims of the United States and agreed to the asserted priority provided that the United States prove the conditions specified in 31 U.S.C. § 191 for the establishment of the priority. In this regard, both parties agreed to submit to the Interstate Commerce Commission for its determination the question whether the estate of the Debtor is insolvent in the bankruptcy sense. The court has not been informed of any further action in connection with this matter.

### V. *Objections of the Town of Madbury, New Hampshire*

The Town of Madbury, New Hampshire objects to the Trustees' proposed classification by claiming that its tax lien on the proceeds of the sale of certain real property is entitled to a priority over all other claims. Class 2 as proposed by the Trustees provides for the proper priority of this tax claim, and no showing has been made of any cogent reason why a separate classification should be created for the tax lien of Madbury, New Hampshire.

### VI. *Conclusion*

The court concludes that the fair division of creditors and stockholders on the showing made in these proceedings should have as of the date of entry of this order the following priority under Section 77(c)(7) of the Bankruptcy Act:

1. Administration claims.

2. State and local tax claims against the Debtor which became a lien upon the property of the Debtor prior to March 12, 1970, excepting state and local tax claims to the extent waived by agreement between the Trustees and the taxing authorities.

3. The holders of First Mortgage Bonds.

4. The holders of Income Bonds.

5. Claims of the United States of America under 31 U.S.C. § 191.

6. The holders of claims, other than claims secured by valid liens, of federal, state and local governmental authorities for taxes found by the court to be based on fair and valid assessments and either secured or to have become legally due and owing during the three-year period preceding March 12, 1970, or otherwise to be entitled to priority in accordance with the provisions of the Bankruptcy Act, excepting state and local tax claims to the extent waived by agreement with the taxing authorities.

7. The holder of the 7½% collateral promissory note, dated June 25, 1969, in the original principal amount of $694,042.34 issued to the National Shawmut Bank of Boston, payable serially to June 15, 1970.

8. The holders of secured claims of the Debtor duly proved in this proceeding and allowed by the court, which security interests are subordinate to the mortgages of the First Mortgage Bonds and the Income Bonds.

9. The holders of general unsecured claims against the Debtor duly proved in this proceeding and allowed by the court (whether or not incurred within six months preceding March 12, 1970, and whether or not arising from the provision of goods and services necessary to the Debtor's operations) including without limitation the promissory note of the Debtor given to Southern Railway Association, and all claims arising by reason of the disaffirmance or rejection, or the failure of the Trustees to accept, any executory contract or unexpired lease of the Debtor to the extent of the actual damage or injury sustained, determined in accordance with the principles of the Bankruptcy Act. In addition, all claims of other railroads' per diem charges in excess of those paid by the Debtor during the period August 1, 1953 through March 12, 1970.

10. Five percent Preferred Stockholders.

11. Common Stockholders.

It is so ORDERED.