**In the Matter of CHICAGO, MILWAUKEE, ST. PAUL AND PACIFIC RAILROAD COMPANY, Debtor.**

**Appeal of CMC REAL ESTATE CORPORATION.**

**No. 88–2979.**

United States Court of Appeals, Seventh Circuit.

Argued April 20, 1989.

Decided Dec. 7, 1989.

Rehearing and Rehearing En Banc Denied Feb. 1, 1990.

**160**

Daniel R. Murray, Jerold S. Solovy, and Barry Sullivan (argued), Jenner & Block, Chicago, Ill., for appellant.

Edward R. Gower, Keck, Mahin & Cate, Marvin F. Metge, Gorham, Metge, Bowman & Hourigan, Chicago, Ill., Charles Stark, I.C.C., William G. Mahoney, Elizabeth Nadeau (argued), Highsaw, Mahoney & Clarke, Washington, D.C., Milton H. Gray, Altheimer & Gray, Terry F. Moritz, Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz, Robin B. Katz, Freeman, Freeman & Salzman, Chicago, Ill., Carlton G. Salmons, Austin & Gaudineer, Des Moines, Iowa, J.S. Thiel, Dept. of Transp., Madison, Wis., Patrick J. McPartland, Minneapolis, Minn., and Peter J. Kilchenmann, Chicago, Ill., for debtor-appellee.

Before CUDAHY, FLAUM and KANNE, Circuit Judges.

KANNE, Circuit Judge.

This case arises out of the reorganization of the Chicago, Milwaukee, St. Paul and Pacific Railroad Company ("Milwaukee Railroad"). The Railroad Labor Executives' Association ("RLEA") filed a motion for summary judgment asserting it was entitled to interest on its claims for the period between the order of the district court requiring that Milwaukee Railroad's rail assets be sold and the date on which the claim became liquidated. The district court granted the motion and held that, as a matter of equity, pre-liquidation interest should be paid. The successor company

from the reorganization, CMC Real Estate Corporation ("CMC"), appeals. We reverse.

## I. BACKGROUND

On December 19, 1977, the Milwaukee Railroad filed a petition for reorganization under Section 77 of the Bankruptcy Act of 1898, 11 U.S.C. § 205 (1976) (repealed by Bankruptcy Reform Act of 1978, § 403(a), Pub.L. No. 95–598, 92 Stat. 2549, 2683).[1] The district court, acting as reorganization court, ordered that rail service be continued in the public interest. The continuation of rail service resulted in losses which required the trustee to raise finances.

One step taken to raise finances was the negotiation of a Wage Reduction Agreement ("WRA" or "Agreement") with Milwaukee Railroad employees through their representative, RLEA. The Agreement, approved by the district court on January 29, 1982, embodied a seven percent reduction in wages which was capable of being partially or fully refunded, depending upon the final sale price of the rail assets. The exact sale price had to be known before the amount to be paid to the employees could be calculated under the formula in the WRA. Despite a request by the RLEA to include a provision in the Agreement for the payment of interest on any amount that might be refunded to the employees, the Agreement included no such provision. Subsequently, on February 19, 1985, the district court awarded the sale of Milwaukee Railroad's core rail assets to the Soo Line despite a much higher final bid by another railroad. This was done, at least in part, to benefit Milwaukee Railroad's employees.[2] The approved Asset Purchase Agreement ("APA") did not contain a definite sale price, but provided that the cash purchase price would be estimated by utilizing available data and information. A

---

1. The Bankruptcy Act of 1898 applies to these reorganization proceedings because Milwaukee Railroad filed its petition before the effective date for the new Bankruptcy Code. *Central Trust Co. v. Official Creditors' Comm. of Geiger Enters., Inc.,* 454 U.S. 354, 355–59, 102 S.Ct. 695, 695–97, 70 L.Ed.2d 542 (1982); *In re Chicago,*

*Milwaukee, St. Paul & Pac. R.R.,* 791 F.2d 524, 525–26 (7th Cir.1986).

2. *See In re Chicago, Milwaukee, St. Paul & Pac. R.R.,* 799 F.2d 317 (7th Cir.1986), *cert. denied,* 481 U.S. 1068, 107 S.Ct. 2460, 95 L.Ed.2d 869 (1987).

180–day period, subject to being extended by the court, was provided in which to resolve adjustments to the cash purchase price. Based on the estimated sale price in the APA, 84% of the reduced wages of the employees would be refunded. Milwaukee Railroad and the Soo Line experienced difficulties in finalizing the sale price—mainly because the Soo Line sought a large reduction in the purchase price.

The trustee filed his proposed plan of reorganization on May 1, 1985. After numerous objections and three days of hearings, the district court approved and confirmed the modified plan on July 12, 1985. The confirmation of the plan was appealed by the RLEA, but the confirmation was affirmed by this court.[3] Under the confirmed plan, the employees' claims for reduced wages were to have interest paid at the rate of eight and a half percent for the period from the liquidation date to the date of payment. The "liquidation date" was defined as the date upon which the principal amount of the claim could be ascertained from the trustee's records. On November 12, 1985, the district court entered an order of consummation and final decree. Subsequently, the parties continued to negotiate the final sale price of the rail assets. Upon request by the trustee, the Soo Line set a $50 million ceiling with respect to its claimed adjustments. The trustee then determined that the undisputed portion of the sale price was sufficient to refund 66% of the reduced wages under the WRA. This refund was distributed in October, 1985.

Negotiations on a final sale price continued for several months. On July 31, 1986, the parties agreed on a final sale price. The district court approved this settlement on September 12, 1986. Soon thereafter the remaining portion of the refund to the employees was distributed.

The RLEA subsequently asserted that the employees were entitled to interest on the reduced wages for the period from the date the district court ordered the assets sold to the Soo Line to the date the refund payments were made. CMC filed a motion to dismiss or for summary judgment with respect to these claims arguing that both the WRA and the confirmed and consummated plan did not provide for payment of such interest. The RLEA filed a response and a cross-motion for summary judgment arguing the district court should exercise its equitable powers to deem the liquidation date to be the date on which the estimated sale price was established in the order to sell the assets to the Soo Line. On September 17, 1988, the district court granted summary judgment in favor of the RLEA. However, the court held the attempt to manipulate the liquidation date was foreclosed by the definition of that term in the plan. Instead, the court's decision was based on its belief that equity "demands" the employees receive interest.

## II. DISCUSSION

We begin our analysis with an examination of the (now repealed) Bankruptcy Act of 1898, and more specifically Section 77 thereof which is the governing statute for this railroad reorganization. 11 U.S.C. § 205 (1976). The statute enumerates the required procedures for the confirmation and consummation of a plan of reorganization. These procedures provide various safeguards to ensure that holders of claims are accorded fair and equitable treatment. Such procedures include: (i) approval of the plan by the Interstate Commerce Commission; (ii) approval by the reorganization judge after hearing objections; (iii) acceptance by stockholders and creditors; (iv) confirmation of the plan by the judge; and, (v) an opportunity to appeal. 11 U.S.C. § 205; *see* Collier on Bankruptcy, § 77, ¶ 77.13 (14th. ed. 1978). Indeed, a judge can approve and confirm a plan only if satisfied that it is fair and equitable. 11 U.S.C. § 205(e).

When the order of confirmation is entered, it binds the debtor and all creditors to the terms of the plan of reorganization. *Id.* § 205(f). The consummation order discharges the debtor from all liabilities. Congress set forth these provisions

**3.** *In re Chicago, Milwaukee, St. Paul & Pac. R.R.,* 827 F.2d 112 (7th Cir.1987).

as important steps in the achievement of the central bankruptcy tenets of equal treatment of creditors and rehabilitation of the debtor. *See In re Boston and Maine Corp.*, 468 F.Supp. 996, 1000 (D.Mass. 1979), *aff'd in part, rev'd in part*, 634 F.2d 1359 (1st Cir.1980), *cert. denied*, 450 U.S. 982, 101 S.Ct. 1518, 67 L.Ed.2d 817 (1981); *cf. New Haven Inclusion Cases*, 399 U.S. 392, 420, 90 S.Ct. 2054, 2073, 26 L.Ed.2d 691 (1970). Before these orders are entered, the claimants, the debtor and the trustee negotiate the various claims to arrive at a plan of reorganization. After the orders of confirmation and consummation have been entered, finality becomes paramount. *See In re Corona Radio & Television Corp.*, 102 F.2d 959, 963 (7th Cir. 1939); *In re Higbee Co.*, 164 F.2d 426, 428 (6th Cir.1947), *cert. denied*, 333 U.S. 863, 68 S.Ct. 745, 92 L.Ed. 1142 (1948); *cf. Stoll v. Gottlieb*, 305 U.S. 165, 170–71, 59 S.Ct. 134, 137, 83 L.Ed. 104 (1938); *In re Union League Club of Chicago*, 203 F.2d 381, 386 (7th Cir.1953). The reorganized entity must be able to go forward with operations and third parties must be able to rely on the orders to assess the financial condition of the reorganized entity.

### A. Retention–of–Jurisdiction

■ The RLEA claims that the finality and other consequences of the orders do not apply here because the reorganization court specifically retained jurisdiction by a provision in the consummation order.[4] The statute provides an exception to the general rule of finality after the entry of orders of confirmation and consummation. The property dealt with by the plan is free from claims "except such as may consistently with the provisions of the plan be reserved in the order confirming the plan...." 11 U.S.C. § 205(f).

The specific provision in the consummation order that the RLEA cites for its argument states that jurisdiction is retained over any matter to which the plan reserved jurisdiction in the reorganization court. A

section in the plan provides that jurisdiction is retained "for the purposes of determining any Claims against the debtor...." The RLEA relies upon these provisions for this argument.

Obviously, provisions in a plan and order cannot contravene the statute. The statutory exception expressly states that retention of jurisdiction must be consistent with the provisions of the plan. Here, a provision in the plan provides for interest to begin to accrue on the "liquidation date." This term is specifically defined in the plan. Thus, to find that interest began to accrue before the liquidation date would not be consistent with the plan. Such a finding would contravene the statute. In *Corona*, we held that a general reservation provision in a consummated plan could not be utilized to permit an alteration inconsistent with the plan itself. 102 F.2d at 963. *See also In re Argyle–Lake Shore Corp.*, 98 F.2d 372, 373–74 (7th Cir.1938) (holding that after entry of a consummation order the court retained jurisdiction only over matters specifically reserved therein). Accordingly, we reject the contention that the broad retention-of-jurisdiction provision in the consummation order permitted reconsideration of the claim for interest. If we were to read this provision as broadly as the RLEA presses, the orders of confirmation and consummation would be virtually useless and the exceptions to finality would overtake the rule.

### B. Exercise of Equitable Powers

■ This conclusion does not end our analysis. The RLEA also argues the district court properly exercised its equitable powers to award interest. A reorganization court is essentially acting as a court of equity. *Pepper v. Litton*, 308 U.S. 295, 304, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939); *In re Witte*, 841 F.2d 804, 808 (7th Cir. 1988). However, the general equity power is not an absolute grant "to do equity." *United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir.1986). In the present case,

---

**4.** Even though the district court did not mention a retention-of-jurisdiction provision in its order, we will examine this claim because the court

may have based its decision on such a provision.

the finality principles must be balanced against the general equitable power of the court to avoid unfairness. Hence, we will examine whether the district court properly exercised its general equitable powers to award pre-liquidation interest to the employees.

The district court found that the WRA "clearly expresses the parties' intention that the WRA gave the employees no right to interest" on the reduced wages. The court then based its decision to award interest on the "gap" in the WRA in not anticipating the length of the delay between the time the sale was ordered and the time a final price was reached.[5] We must now determine whether the length of the delay here was unanticipated and unfair to an extent that it required the intervention of equity at the expense of finality.

Initially, it is obvious that some delay in the determination of a final sale price was anticipated. The APA provided for a six-month period to resolve adjustments to the cash purchase price. This period was capable of being extended and in fact was so extended. In *Insurance Group Comm. v. Denver & R.G.W.R. Co.*, 329 U.S. 607, 67 S.Ct. 583, 91 L.Ed. 547, *reh'g denied*, 330 U.S. 854, 67 S.Ct. 860, 91 L.Ed. 1296 (1947), the debtor wanted re-examination of a confirmed plan because World War II brought on unanticipated conditions in rail transportation demand, steel production, and money rates. The Court assumed, arguendo, that post-confirmation changes in conditions could be considered for the purpose of re-examination. It declined to re-examine the confirmed plan, however, because the debtor failed to allege changed conditions of a

kind not considered when the plan was approved. 329 U.S. at 611–12, 67 S.Ct. at 585. These unanticipated conditions were far more severe than the delay involved here. This case illustrates the narrow circumstances under which a court should exercise equity to disturb a confirmed plan.

In addition, it is not at all clear that the delay here was unfair to the employees. In fact, the delay actually enured to the benefit of the employees since a greater sum was ultimately returned than was provided for in the APA.[6] Also, it is significant to the fairness consideration that a provision for pre-liquidation interest was sought to be included in the WRA, but was rejected.[7] We find the facts here did not require the intervention of equity to award pre-liquidation interest, and the district court abused its discretion in doing so.

## III. CONCLUSION

For the reasons above, we REVERSE the district court's grant of summary judgment awarding interest on the RLEA's claim.

CUDAHY, Circuit Judge, dissenting:

In this case, a group of railroad workers agreed to a contingent reduction in their wages, for what turned out to be a three year period, in order to help their employer continue its railroad operations in the face of mounting losses. The employees' wages were to be returned when, and if, the company was profitably sold. The company *was* profitably sold, but a final determination of the sale price took approximately 19 months and, as a result, the employees had

5. We question whether a "gap" exists in the WRA since, under the formula therein, the exact final sale price had to be known before the amount to be paid to the employees could be determined and a request for pre-liquidation interest was rejected.

6. The APA was approved on February 19, 1985, and provided for a return of 84% of the reduced wages within 180 days. The Soo Line sought a reduction in the purchase price, but Milwaukee Railroad did not concede the reduction and continued to negotiate. As a result, 100% of the reduced wages were returned. A return of 100% of the wages without interest is greater than 84% of the wages plus 8.5% interest for 19

months (let $1 be the amount of the reduced wages; if CMC had settled for the amount estimated in the APA, the employees would have been returned $.84 + $.134 (8.5% × 1.58 (19 months) × $1) or 97.4¢ instead of $1). Even this figure is too high since a six-month delay was clearly anticipated by the APA (thus, the 19–month multiplier is too high) and 66% of the wages were returned within eight months of the approval of the APA (thus, the $1 multiplier is too high).

7. Presumably, during the negotiations for the WRA, the Milwaukee Railroad made other concessions in order to exclude interest. Thus, the court should not rewrite the parties' contract.

to wait some time for the return of part of their wages. The employees now want an award of interest to compensate for this delay.

The Wage Reduction Agreement (the "WRA") signed by the employees' union contains no provision for interest on the employees' claims, but none of the relevant documents in the case has a provision which allows expressly for a delay as long as 19 months in ascertaining the amount of money that would be returned to the employees. Thus, the essential question presented by the case is whether there was a "gap" in the controlling documents (the Wage Reduction Agreement, the Asset Purchase Agreement (the "APA") and the Plan of Reorganization (the "Plan")) which was within the discretion of the reorganization court to fill. This is the dispositive issue whether one views the case from the perspective of jurisdiction or analyzes the legal or equitable merits. For, if the issue was resolved by the Plan, and there was no gap, the Plan's general reservation of jurisdiction provision would not authorize "reconsideration" of matters already settled and confirmed. If, on the other hand, there was a gap—that is, new and unforeseen circumstances not provided for by the Plan—the bankruptcy court would have discretion to exercise its jurisdiction in deciding how the gap should be filled. *See, e.g., United States v. Georgia Power Co.,* 634 F.2d 929, 932 (5th Cir.1981) ("The power of a court of equity to modify the prospective effect of its decrees in response to changed circumstances is 'inherent in the jurisdiction of the Chancery.'" (*quoting United States v. Swift & Co.,* 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932))).

The logic of CMC's and the majority's position here is that, however long it might take to negotiate the price, interest could not accrue until a final sale price was agreed to and approved. This, they say, follows from the definition of "liquidation date" in the Plan and from the language of the WRA. According to the majority's reasoning, if the negotiations had taken, for example, ten years, the employees would have apparently been entitled to no interest even though all or part of their wage re-

ductions remained for that period in the hands of CMC, a solvent debtor coming into a net worth of more than $400 million. Perhaps the majority would persevere in its reasoning in the ten-year case or perhaps it would think that case extreme. Certainly, with a ten-year delay, there would be a strong case for changed circumstances—that is, a gap in the provisions of the Plan and the WRA. The question then is how long would the delay have to be for it to be regarded as so far outside the contemplation of the parties as to justify equitable intervention.

A delay of 180 days for determining the sale price was explicitly anticipated by the APA. Therefore, a delay for negotiations of up to six months could hardly result in a gap within which equity could be invoked. Beyond six months, the determination of exactly where a gap—a change in circumstances justifying equitable intervention— might come into existence, is, I believe, itself a job for equity. And, in making that equitable calculation, one must weigh CMC's strongest equitable argument—that in prolonging negotiations it improved the employees' recovery as well as its own— against the employees' most powerful argument—that they had made an interest-free loan to a debtor which turned out to be quite solvent. *In re Shaffer Furniture Co.,* 68 B.R. 827, 830 (Bankr.E.D.Pa.1987) ("[B]ased upon general equitable principles, post-petition interest ought to be paid to the creditors of solvent debtors before proceeds of liquidation are returned to the debtor."); *In re San Joaquin Estates, Inc.,* 64 B.R. 534, 535–36 (Bankr. 9th Cir.1986) ("[A]n award of post-petition interest may be allowed when the estate is solvent."), *citing In re Walsh Construction,* 669 F.2d 1325 (9th Cir.1982).

Just where equity would draw the line between reasonably anticipated circumstances and changed and unforeseen circumstances is hard to determine in this case. I might not have drawn it as close as Judge Marshall. But, I think it was within his discretion to draw it where he did. Judge Marshall's decision is to be judged by an abuse of discretion standard. The

test is whether any reasonable person could agree with him, and I think that test has been met. *Hough v. Local 134, IBEW,* 867 F.2d 1018, 1022 (7th Cir.1989) ("[i]f reasonable [persons] could differ as to the propriety of the court's action, no abuse of discretion has been shown." (quoting *Smith v. Widman Trucking & Excavating,* 627 F.2d 792, 796 (7th Cir.1980))).

I therefore respectfully dissent.