In re COSERV, L.L.C. d/b/a CoServ
Communications, et al.,
Debtors.

No. 01–48684.

United States Bankruptcy Court,
N.D. Texas,
Fort Worth Division.

Jan. 4, 2002.

488

Holland Neff O'Neil, Richard M. Roberson, Merrill L. Kaliser, Gardere Wynne Sewell, LLP, Dallas, TX, for Debtors.

### MEMORANDUM OPINION

DENNIS MICHAEL LYNN, Bankruptcy Judge.

Before the Court is Debtors' Emergency Motion for Order Authorizing Payment of Prepetition Claims of Critical Vendors (the "Motion"). The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(a). The Motion is a core proceeding under 28 U.S.C. § 157(b)(2),(A), (B) and (O). This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law (Fed. R. Bankr.P. 7052, applicable to the Motion pursuant to Fed. R. Bankr.P. 9014).

### I.

### *Background*

This case involves six related debtors: CoServ, L.L.C. d/b/a CoServ Communications, CoServ Telecom Holdings, L.P., CoServ Telecom GP, L.L.C., DWB GP, Inc., Multitechnology Services, L.P., d/b/a CoServ Broadband Services and Dallas Wireless Broadband, L.P., d/b/a CoServ Broadband[1] (collectively "Debtors" or "CoServ"). Debtors each filed a petition for relief under Chapter 11 of the Bankruptcy Code on November 30, 2001. By order entered the same day, Debtors' cases were consolidated for administrative purposes.

Debtors' principal businesses consist of providing telecommunications services, cable television, website development and hosting in parts of North Texas. In some areas, Debtors are the only providers of these services.

On March 15, 2001 CoServ, together with non-debtor affiliates, entered into a restructuring agreement with their Lender, National Rural Utilities Cooperative Finance Corporation ("Lender" or "CFC"). Thereafter, CoServ agreed with CFC to sell the six companies' assets by September 30, 2001. No purchaser was found by the target date, but subsequently CoServ entered into a non-binding term sheet with Stellar Holdings, L.L.C. ("Stellar") for a sale of the assets (in a going-concern configuration) for $90,000,000. CoServ then commenced these cases to effectuate the sale. Debtors anticipate early consumma-

---

1. Debtors are part of a larger corporate fami-ly.

tion of the sale and so do not expect to operate in Chapter 11 for a long period of time.

Debtors claim that they owe Lender approximately $26,000,000 prepetition and that the sale of their assets (in a going-concern configuration) to Stellar [2] will provide a substantial return to all creditors. CFC disputes the amount owed to it and has suggested in pleadings and statements to the Court that Debtors' obligations to it substantially exceed $90,000,000. In any case, it appears that Debtors' businesses will continue in the future. Thus it is in the interests of unsecured creditors, so far as it is consistent with prudent business practices, to facilitate Debtors' maintenance of their businesses. Not only will this make payment of unsecured claims more likely; it will in many cases preserve an ongoing customer.

Debtors have negotiated an agreement with Lender for the use of cash collateral and $5,400,000 in additional financing. This agreement has been preliminarily approved by the Court. Between use of cash collateral and the substantial additional funds CFC will make available to Debtors, Debtors should not have a problem meeting post-petition obligations.

Debtors filed the Motion contemporaneously with their petition with other "first-day pleadings." The Court held hearings on "first day pleadings" on December 4, 2001. At that time Debtors requested that the Court defer consideration of the Motion until December 14, 2001. Hearing of the Motion was continued again at Debtors' request to December 20, 2001.

At the time of the initial hearing, Debtors sought authority to expend $2,272,265.93 in payment of prepetition claims of 27 creditors. The Court expressed concern with the nature and extent of the Motion, and, by December 20, Debtors had narrowed the list of "critical vendors" to seven creditors to whom Debtors wished to pay $563,183.00 of prepetition indebtedness. However, at the hearing counsel for the Official Unsecured Creditors Committee (the "Committee") suggested the list should be expanded to include additional "critical vendors" (some of whom are members of the Committee).

The Lender initially opposed the Motion. Once pared down, however, on December 20 the Lender announced that it neither opposed nor supported the Motion.[3] Only one other party (Temple, Inc., designated by Debtors as one of the critical vendors), participated in the December 20 hearing.[4] In support of the Motion Debtors presented the testimony of Steven Chisholm, Debtors' president, Ron Clinton, Debtors' chief financial officer, and Terry R. Falls, Debtors' engineering and planning vice president. The specific testimony of these witnesses will be discussed later in this memorandum opinion.

## II.

### The Issues Presented by the Motion

Though the Motion was not opposed, the Court is not prepared to grant it solely on that basis. In the first place, the Court has an independent obligation to ensure

---

2. Debtors hope additional bidders will result in a higher sale price.

3. CFC did express concern about the Committee's position that more creditors should be designated as "critical vendors" and paid their prepetition claims.

4. Temple only participated in the hearing to clarify that it was not threatening reprisal if its claim were not paid. Temple's counsel did imply his client was contemplating shutting down the warehouse facility that serves Debtors, but no evidence was introduced to substantiate that.

that the Bankruptcy Code is complied with. In the second place, the United States trustee was not present on December 20. In other cases before this Court, the United States trustee has opposed payment of employee expenses (as opposed to wages, salaries or commissions) because their payment would discriminate improperly among unsecured creditors. Third, the remarks of counsel for the Committee suggest that there are additional "critical vendors" awaiting the Court's granting of the Motion whose pleas for special treatment are likely to follow a favorable ruling. Thus the Court believes it is necessary to treat the Motion as a contested matter and decide it based on the law and the record made on December 20.

The Motion presents the Court with three questions:

1. May a bankruptcy court ever authorize, pre-plan, a Chapter 11 debtor to pay prepetition general unsecured claims?

2. If so, what test should the bankruptcy court apply in deciding whether a claim should be paid?

3. Which, if any, of the claims Debtors seek to pay should the Court authorize Debtors to pay?

### III.

### *Discussion*

■ Debtors assert that, on the basis of the "Doctrine of Necessity" (or the "Necessity of Payment Rule"), this Court has ample equitable powers to authorize pre-plan payment of selected prepetition claims. The Court does not disagree that it can allow the Debtors to pay prepetition debt other than pursuant to a plan—but holds it may do so only under extraordinary circumstances. Thousands of debtors have successfully navigated through Chapter 11 in the past without paying the prepetition claims of "critical" vendors. Despite the increasing willingness of courts in a few jurisdictions to allow payment of prepetition claims long prior to consummation of a plan, this Court does not believe there has been a sea change in the law that would warrant such a drastic expansion of the "Doctrine of Necessity," a device to be used only in rare cases.

### A. *The Debtors' Position*

In the Motion and an accompanying Memorandum of Law[5] (the "Memorandum") the Debtors cite extensive authority for the proposition that the Code permits payment of prepetition claims even in exchange for assurances by the creditor of post-petition credit (Motion at 5, citing *In re Just for Feet, Inc.*, 242 B.R. 821 (D.Del. 1999) and other, unreported Delaware decisions).

The principal statutory basis for the Court's power to permit payment of prepetition claims is found by Debtors in 11 U.S.C. § 105(a).[6] Debtors, however, also cite cases which have relied on the court's authority under 11 U.S.C. § 363(b)(1) to utilize property of the estate other than in the ordinary course of business (*See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176

---

**5.** The Memorandum was filed in support of both the Motion and a motion seeking authority to pay prepetition wages and benefits. The Court granted most of the relief sought in the latter motion.

**6.** Section 105(a) reads: "The court may issue any order, process, or judgment that is necessary or appropriate to carry out due provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process."

(Bankr.S.D.N.Y.1989)); the powers of the debtor in possession pursuant to 11 U.S.C. § 1107(a) (*See id.*); and even the Court's power under 11 U.S.C. § 549 to reverse a post petition transfer (In *In re Isis Foods, Inc.*, 37 B.R. 334, 336 n. 3 (W.D.Mo.1984) the court implied Section 549 might permit a bankruptcy court to authorize such transfers).

7. The Doctrine of Necessity (the "Doctrine") is an outgrowth of case law under and preceding the bankruptcy act. Two separate doctrines, the Six Months Rule and the Necessity of Payment Rule, have given rise to the Doctrine as it is known today.

### The Six Months Rule

The Six Months Rule originated with the practice of initiating a railroad receivership case with an order appointing a receiver who was authorized to pay certain prepetition debts for labor, supplies or equipment from post-petition funds. *See In re B & W Enter., Inc.*, 713 F.2d 534, 536 (9th Cir.1983). The Rule was equitable and only applied to expenses necessary for the continued operation of the railroad that arose immediately preceding the petition. *See id.* The Rule was codified in section 77(b) of the bankruptcy act, and stated:

> "unsecured claims, which would have been entitled to priority if a receiver in equity of the property of the debtor had been appointed by a Federal court on the day of the approval of the petition, shall be entitled to such priority and the holders of such claims shall be treated as a class or classes of creditors."

This provision was located in the chapter of the bankruptcy act that dealt only with railroad reorganizations. No analogous section was located in any other chapter. The Rule was later adopted in 11 U.S.C. § 1171(b) of the Code, part of Subchapter IV of Chapter 11, which deals just with railroad reorganizations. *See* 11 U.S.C. § 103(g). The Notes of the Committee on the Judiciary, House Report No. 95–595, U.S.Code Cong. & Admin.News 1977, 5963, indicate that § 1171(b) "follows present section 77(b) of the Bankruptcy Act ... by giving priority to any unsecured claims that would be entitled to priority if a receiver in equity of the property of the debtor had been appointed by a Federal court on the date of the order for relief under the bankruptcy laws." Additionally, the Notes indicate that § 1171 "is derived from current law." *See id.*

### The Necessity of Payment Rule

The Necessity of Payment Rule, unlike the Six Months Rule, is a rule of payment not of priority. *See In re Boston & Maine Corp.*, 468 F.Supp. 996, 1008 (D.Mass.1979). This Rule developed to allow trustees to pay prepetition debts under threats of creditors in order to obtain continued supplies or services essential to the continued operation of the debtor's business. *See In re B & W Enter., Inc.*, 713 F.2d at 537. The early line of cases dealing with this Rule were limited to railroad reorganizations, and emphasized that, if no threat to the continued operation of the railroad was implicated, the Rule was inapplicable. *See In re Boston & Maine Corp.*, 468 F.Supp. at 1008.

The Rule has occasionally been extended to non-railroad debtors. *See Dudley v. Mealey*, 147 F.2d 268 (2d Cir.1945) (but see discussion of *Dudley* in text following n. 16, *infra;* other courts declined to extend the Rule to non-railroad cases. *See, e.g., In re B & W Enter., Inc.*, 713 F.2d at 537); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174 (Bankr. S.D.N.Y.1989). In *Ionosphere,* the court relied on the Rule to authorize the payment of active employees' prepetition wages, salary and benefit claims. The court analogized the case before it (that of Eastern Airlines) to the railway cases. *See In re Ionosphere Clubs*, 98 B.R. at 176. These cases emphasized that the Rule was applicable to further a paramount consideration of chapter 11, that of continued operation and rehabilitation of the debtor. *See id.* It is this line of case law that requires the "debtor to show that payment of the prepetition claims is 'critical to the debtor's reorganization.' " *See In re Just for Feet, Inc.*, 242 B.R. at 826 (citing *In re Financial News Network, Inc.*, 134 B.R. 732, 736 (Bankr.S.D.N.Y. 1991); *In re NVR L.P.*, 147 B.R. 126, 128

L.Rev. 1 (1989) [hereinafter "Eisenberg & Gecker"]. These authorities lead Debtors to the conclusion that this Court may authorize payment of prepetition claims to ensure continuation of the Debtors' operations (Motion at 5, Memorandum at 4); if the payment is critical to Debtors' reorganization (Motion at 5, Memorandum at 4); to "facilitate the continued operation and rehabilitation" of the Debtors (Motion at 5, citing *In re Ionosphere Clubs, Inc.*, 98 B.R. at 176); to preserve the going concern value of the Debtors (Memorandum at 4); "to realize the paramount purpose of a Chapter 11 reorganization—preventing liquidation of the debtor in possession and preserving its potential for rehabilitation" (Memorandum at 5); to induce creditors to supply services or material essential to conduct of the business (Memorandum at 6 and 7); to avert a threat to the Chapter 11 process (Memorandum at 8); and to obtain customary trade terms from creditors (Motion at 5, Memorandum at 8). The Debtors suggest (Memorandum at 6) that there is a flexibility inherent in the Bankruptcy Code such that "it is well established that, particularly in the early stages of the case, a court may authorize payment of prepetition debts in order to preserve [the] potential for rehabilitation." (Memorandum at 6, quoting Robert Ordin, *Finality of Order of Bankruptcy Court*, 54 Am. Bankr.L.J. 173, 177 (1980)).

### The Court's Analysis

### 1. The Bankruptcy Code:

■ The Court finds no support in Section 549 or Section 363(b)(1) for payment of prepetition claims. Only Section 105(a) offers the equitable muscle that would allow a bankruptcy court to violate one of the principal tenets of Chapter 11: that prepetition general unsecured claims should be satisfied on an equal basis pursuant to a plan.[8]

■ And the equitable power that the Court may exercise under Section 105(a) is severely circumscribed.[9] Except where an unsecured claim, non-payment of which could impair a debtor's ability to operate, has been accorded priority treatment by Congress and existing senior creditors consent or are clearly provided for,[10] a

(Bankr.E.D.Va.1992); *In re Eagle–Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D.Ohio 1991)).

In the extension of the Necessity of Payment Rule to non-railroad debtors, the Doctrine was born and the Rule became known as the "Doctrine of Necessity." *See* Eisenberg & Gecker at 6. As later cases arose, courts often used the terms "Doctrine of Necessity" and "Necessity of Payment Rule" interchangeably.

**8.** *See In re Boston & Maine Corp.*, 468 F.Supp. 996, 1001 (D.Mass.1979); *In re Chateaugay Corp.*, 80 B.R. 279, 287 (S.D.N.Y.1987).

**9.** *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988); *In re Oxford Mgmt., Inc.*, 4 F.3d 1329, 1334 (5th Cir.1993); *Official Comm. of Equity Sec. Holders v. Mabey*, 832 F.2d 299, 302 (4th Cir.1987), *cert. denied*, 485 U.S. 962, 108 S.Ct.

1228, 99 L.Ed.2d 428 (1988). Moreover, Section 105(a) on its face may be used only to carry out the provisions of Title 11. *See* 2 Collier on Bankruptcy ¶ 105.04[5] (15th ed. rev.2001); *See also In re Oxford Mgmt., Inc.* at 1333–34. The Court emphasizes use of section 105(a) to pay prepetition claims is generally *inconsistent with* rather than in *furtherance of* the provisions of the Bankruptcy Code.

**10.** Thus, in the case of payment of CoServ's wage claims, only the Lender (whose cash collateral would be used to pay wage and benefit claims) and professionals (accorded priority under Section 507(a)(1) and so entitled to payment ahead of employee claims having priority under Section 507(a)(3) and (4)) could be affected. All of these persons supported payment of the wage claims. Later cost claimants (if any) will extend their credit

bankruptcy court may order payment of unsecured prepetition claims only under the most extraordinary circumstances.

This view is supported by reference to other provisions of the Bankruptcy Code. Congress clearly knew how to place some unsecured claims ahead of others in right to payment. 11 U.S.C. §§ 507(a) and 1171(b). Congress also knew how to give a general unsecured prepetition creditor special protections which might lead to post-petition, pre-plan satisfaction of its claim. Sections 546(c) and (d) provide post-petition reclamation rights to certain creditors, and Section 547(c)(3) allows post-petition perfection of a security interest securing a prepetition debt, so raising a creditor from unsecured to secured status. Section 366 provides special treatment for utilities to protect against future loss without even requiring the existence of a prepetition claim.

On the other hand, the entire scheme of the Bankruptcy Code favors equal (and simultaneous) treatment of equal allowed claims (see, e.g., 11 U.S.C. §§ 362(a), 726, 1122 and 1129(b)(1)). The goal of equal treatment in liquidation or under a plan suggests Congress would not countenance use by a general unsecured prepetition creditor of a "critical" position to force payment of a prepetition debt. Section 362(a)(6)[11] on its face appears to prohibit such "economic blackmail." *See In re Structurlite Plastics Corp.*, 86 B.R. 922, 932 (Bankr.S.D.Ohio 1988) ("Selective re-payment [sic] of pre-petition debt should not be authorized as a result of threats or coercion by disgruntled creditors. Such activity is violative of the automatic stay imposed by 11 U.S.C. § 362(a) and, if tolerated, would negate the fundamental principle of equality of treatment among similarly situated creditors"); *see also* Eisenberg & Gecker at 38.[12]

■ This is not to say that the creditor placed in dire straits by a debtor's bankruptcy must supply the debtor when to do so would risk its own insolvency. Mechanisms such as a deposit[13] by the debtor, payment on delivery, payment in advance, letters of credit and consignment of goods are available to ensure against further loss

and so create their priority claims under Section 507(a)(1) on notice of prior satisfaction of the junior employee claims. The Court expresses no opinion regarding payment of Section 507(a)(3) claims in a case commenced involuntarily in which claims entitled to priority under Section 507(a)(2) remain outstanding, though wage claims typically are payable out of necessity as well as by virtue of their priority.

11. Section 362(a)(6) provides that "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title" is a violation of the automatic stay.

12. At the December 20 hearing, counsel for Debtors argued that, absent payment of its prepetition claim, a supplier has as much right to refuse to deal with a debtor as a lender to refuse to advance a debtor additional funds (11 U.S.C. § 365(c)(2)). The two

situations, however, are inapposite. Any given lender clearly is not the only game in town and, further, may not be forced to accept additional risk of non-payment. The vendor whose relationship with the debtor is irreplaceable and is offered cash on delivery or in advance is in a different circumstance, facing no additional risk. Without deciding the issue, this Court not only believes a case could be made that such a vendor's absolute refusal to supply the debtor absent payment of a prepetition claim would be in violation of Section 362(a)(6) of the Code (which would warrant sanctions, not a mandate to sell to the debtor) but also that if a debtor succumbed to such "economic blackmail," Section 510(c) of the Code might be available at a later date to correct an inherently inequitable situation.

13. Compare 11 U.S.C. § 366(b). Also note other references to "adequate assurance" of payment, *inter alia*, in Section 365.

by such a creditor.[14] If means of this sort are inadequate, the case may fit the standards fixed by the Court, *infra.*

### 2. *Case Law*

Debtors' position finds mixed support in case law. Though courts in the Second, Third and Seventh Circuits have authorized payment of prepetition debt, the Fifth Circuit, among others, has come perilously close to the view of the bankruptcy court for the District of Montana. Citing decisions rendered by the Ninth Circuit and the bankruptcy courts for the Middle District of Pennsylvania and the Eastern District of Missouri, the court in *In re Timberhouse Post & Beam, Ltd.,* 196 B.R. 547, 550–551 (Bankr.D.Mont.1996) adopted a "bright line rule ... that a prepetition unsecured claim cannot be elevated to an administrative expense ..." The Fifth Circuit in *Matter of Oxford Management, Inc.,* 4 F.3d at 1333–1334 took almost as hard a line:

> The appellant objects to the bankruptcy court's determination that post-petition funds be used to satisfy appellees [sic] claims ...
>
> Section 105(a) authorizes a bankruptcy court to fashion such orders as are necessary to further the substantive provisions of the Bankruptcy Code.... But, the powers granted by that statute must be exercised in a manner that is consistent with the Bankruptcy Code.
>
> Neither the appellees nor the bankruptcy court cited a specific provision of the Code that would allow payment of post-petition funds to satisfy prepetition claims. By commanding payment, the bankruptcy court elevated the status of the appellees above that of the other general unsecured creditors.... This order effectuated an unpermissable alteration of the Code's provisions.

Though *Oxford* involved real estate commissions and is arguably distinguishable from the case at hand (not necessarily to the advantage of Debtors), the bankruptcy court for the Southern District of Texas recently in *In re Equalnet Communications Corp.,* 258 B.R. 368, 369 (Bankr. S.D.Tex.2000) opined that *Oxford* proscribed payment of prepetition claims prior to confirmation of a plan.[15]

Payment of general unsecured claims other than under a plan is also, in this Court's view, inconsistent with the Fifth Circuit's holding in *In re AWECO,* 725 F.2d 293 (5th Cir.1984), *cert denied,* 469 U.S. 880, 105 S.Ct. 244, 83 L.Ed.2d 182 (1984). In that case the Court of Appeals reversed approval of the pre-plan compromise and satisfaction of an unsecured claim on the basis that the settlement violated the absolute priority rule. *See id.; see also In re Boston & Providence R.R. Corp.,* 673 F.2d 11 (1st Cir.1982).

Finally, this Court questions whether the broad authority Debtors would accord it is consistent with recent Supreme Court decisions reversing categorical subordination of claims. *See United States v. Noland* 517 U.S. 535, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996) and *United States v. Reorganized CF & I Fabricators,* 518 U.S.

---

**14.** With CFC's agreement to advance Debtors an additional $5,400,000, Debtors should be able to satisfy post-petition claims and offer suitable assurance of payment.

**15.** *See also In re Tri–Union Dev. Corp.,* 253 B.R. 808 (Bankr.S.D.Tex.2000). The *Equalnet* court suggested four exceptions to *Oxford's* prohibition: (i) turnover of cash collat-eral; (ii) cure of arrearages under executory contracts or leases; (iii) minute business transactions that are immensely important to the debtor's survival; and (iv) priority claims critical to the ongoing nature of the business. *See In re Equalnet Communications Corp.,* 258 B.R. at 369–70.

213, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996). While preferring "critical vendors" may not equate to subordination of a tax or tax penalty, it has the smell of a similar inappropriate adjustment of congressionally established priorities—and therefore is at odds with the rationale of *Noland* and *CF & I Fabricators.* Indeed, the effect of granting the Motion will be to incur more senior debt at the expense of unpaid unsecured creditors, since CFC's secured, super-priority, post-petition loan will increase concomitantly with the amounts paid pursuant to the Motion.

Many of the cases cited by Debtors are either clearly distinguishable from the instant case or provide minimal support for granting the Motion. In *In re Ionosphere Clubs, Inc.,* 98 B.R. 174, the issue was whether striking employees were entitled to the same treatment (payment of prepetition wages and benefits) as working employees. Payment post-petition of prepetition wages of *working* employees is a different case than payment of general unsecured prepetition claims (see n. 10, *supra*), thus *Ionosphere Clubs* offers no support other than *dicta* for the Motion. *In re NVR L.P.,* 147 B.R. 126 denied the debtor's motion to pay a prepetition claim of a consultant, though the court recognized that a prepetition claim meeting a sufficiently high threshold might be payable.[16]

In *Dudley v. Mealey,* 147 F.2d 268 (2d Cir.1945), the court (per Learned Hand, J.) extended the "Necessity of Payment Rule", hitherto applied in railroad reorganizations, to a Chapter X case to permit payments of certain prepetition vendors ahead of bondholders. However, Judge Hand's decision was in the context of classification of claims for plan purposes in a

reorganization case under the bankruptcy act. Given these distinguishing facts and Chapter X's stringent absolute priority rule as well as other differences from the present statutory scheme, *Dudley* provides little if any support for Debtors.

*Miltenberger v. Logansport, Ry. Co.* 106 U.S. 286, 1 S.Ct. 140, 27 L.Ed. 117 (1882), involved a contest between an equity receiver for a railroad and a minority group of holders of one of two issues of bonds. At the time of *Miltenberger* (and the underlying events) there was no bankruptcy law on the books in the United States. While the case may be the seed from which the "Necessity of Payment Rule" grew, it is not of assistance in construing this Court's powers under the Bankruptcy Code.

In *In re SIS Corp.,* 108 B.R. 608 (Bankr.N.D.Ohio 1989) the preplan payment was in cure of an assumed contract. *Cf. In re Structurlite Plastics,* 86 B.R. at 922 (court found no executory contract and no necessity of payment). This Court would not question the propriety of payment of prepetition arrearages in connection with assumption of a contract and views assumption cases as inapposite to the issue presented by the Motion.

In summary, even a cursory review of the law makes clear that this Court does not possess the broad powers advocated by Debtors for approving payment of prepetition claims. The question for the Court, then, is whether, in this circuit, a bankruptcy court may *ever* authorize payment of general unsecured prepetition claims.

3. *Claims May be Paid if Necessary to Performance of the Debtor in Possession's Fiduciary Duty*

■ To get from section 105(a) to the Doctrine of Necessity, the Court must find

---

**16.** Other cases cited by Debtors denied payment of the allegedly "critical vendor." *See In re Columbia Gas Sys., Inc.,* 171 B.R. 189 (Bankr.D.Del.1994); *In re Isis Foods, Inc.,* 37 B.R. at 334.

a bridge that makes application to the Doctrine of Necessity "necessary or appropriate to carry out the provisions of" the Bankruptcy Code (11 U.S.C. § 105(a)). The Court believes such a bridge exists in the debtor in possession's role as the equivalent of a trustee. *See* 11 U.S.C. § 1107(a). A debtor in possession, like a trustee, is a fiduciary holding the bankruptcy estate and operating the business for the benefit of its creditors and (if the value justifies) equity owners. *See* 7 COL-LIER ON BANKRUPTCY ¶ 1106.02[3] (15th ed. rev.2001); *Dodson v. Huff (In re Smyth, III)*, 207 F.3d 758, 761 (5th Cir.2000); *Sherr v. Winkler*, 552 F.2d 1367, 1374 (10th Cir.1977). Implicit in the duties of a Chapter 11 trustee or a debtor in possession as set out in Sections 1106 and 704 of the Bankruptcy Code is the duty of such a fiduciary to protect and preserve the estate, including an operating business's going-concern value.[17]

There are occasions when this duty can only be fulfilled by the preplan satisfaction of a prepetition claim. Examples that come to mind include the foreign creditor beyond the bankruptcy court's reach that enforces its prepetition claim against foreign assets of the estate or refuses, absent payment, to supply an unique piece of equipment or manufacturing component. Another category of prepetition claims which must be dealt with is the prepetition warranty or refund claims of consumer customers which, if not honored, could so harm the debtor's good will as to destroy its going concern value (like employees, the bankruptcy court cannot force consum-

ers to deal with the debtor, nor is there a practical alternative to satisfying warranty or refund claims). Rental deposits and other claims that arise prepetition but come due post petition may require payment to avoid sanctions under state law as well as loss of good will. Claims may require payment to avoid loss of a license through the exercise of a jurisdiction's police power. It may be that payment of a prepetition unsecured claim is the only means to effect a substantial enhancement of the estate, and here, too, payment would be justified.

These are simply examples of claims that may require satisfaction for the debtor in possession to perform its fiduciary obligations. In such instances it is only logical that the bankruptcy court be able to use Section 105(a) of the Code to authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate.

Cases cited by Debtors that refer to necessity of payment to preserve going concern value imply such a rule, and this Court is prepared to apply the Doctrine of Necessity to authorize payment of prepetition claims in appropriate cases. None of the cases reviewed by the Court, however, articulates a clear standard for when Section 105(a) may be so used. Because the bankruptcy court's equitable powers should be used sparingly in authoring payment of prepetition claims, *see* Eisenberg & Gecker at 5–6; *see also Mabey*, 832 F.2d at 302, it is important that the guidelines for their exercise should be stated with some specificity.[18]

---

**17.** The duty of preservation and enhancement of the estate is also reflected in cases which cite the best interests of the estate as a pivotal issue. *See In re Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir.1993) (citing *In re Minges*, 602 F.2d 38, 43 (2d Cir.1979)).

**18.** *Equalnet, supra*, 258 B.R. at 370 comes closest to providing standards for deciding whether a claim may be paid. In this Court's judgment, however, it is not adequate to identify all claims where payment is justified. For example, the *Equalnet* court's list of exceptions to the general rule does not provide for the foreign creditor or the claim payment of

## B. *Test for Payment of Prepetition General Unsecured Claims*

The Court finds it appropriate to develop its own test to be applied in resolving whether a general unsecured prepetition claim should be paid. Even though this issue has already been addressed by numerous courts, the guidance afforded by prior opinions applying the "Doctrine of Necessity" has been limited to general standards like "essential to the continued operation of the debtor," *see In re Just for Feet,* 242 B.R. at 825.; "facilitation of rehabilitation," *see In re Ionosphere Clubs,* 98 B.R. at 175; or "critical to reorganization" *see In re Financial News Network, Inc.,* 134 B.R. at 736 (*see further* part III.A., *supra* ). None of these formulations provides meaningful guidance to practitioners, leading to the filing of pleadings like the Motion requesting relief far beyond any reasonable concept of necessity. Accordingly, this Court will adopt the following test of "necessity" that must be met before it will approve payment of a general unsecured prepetition claim.

█ The debtor must show three elements are present. First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

which would result in a net increase in the estate. The Court believes the test it articulates below provides the flexibility needed to accommodate a wide variety of situations without supplanting the debtor's convenience for true necessity of payment.

If these three conditions are proven by a preponderance of the evidence, necessity of payment has been shown, and this Court will authorize payment of the prepetition claim. By way of further explanation, the Court will discuss these elements in greater detail below.

1. The debtor must deal with the claimant.

█ To meet this requirement debtor must show that, for one reason or another, dealing with the claimant is virtually indispensable to profitable operations or preservation of the estate. The debtor's customers,[19] sole suppliers of a given product and creditors having control over valuable property of the estate would satisfy this element of the Court's standard.

2. A failure to deal with the claimant risks probable harm or eliminates an economic advantage disproportionate to the amount of the claim.

█ It is obviously a bad bargain to pay $100,000 to recover $10,000 of estate property of which a claimant has possession. Likewise, payment of a large claim in the hope of favorable credit terms[20] merits careful analysis that shows net economic benefit before superceding the prohibition against payment of prepetition claims. To meet the second element of this Court's test, a debtor must show that meaningful economic gain to the estate or the going concern value of the business will result or that serious economic harm will be avoided through payment of the prepetition claim,

19. Not every customer will satisfy the test. Furthermore, a customer bound to the debtor by contract will fail to meet the third prong of the test.

20. This Court questions whether favorable credit terms alone ever would meet the net benefit requirement.

which itself is materially less than the potential loss to the estate or business.

3. There is no practical or legal alternative to payment of the claim.

The Court has already referred, *supra*, to some practical alternatives to payment of a prepetition claim. If payment is intended to assuage the claimant's concern about future dealings, a deposit, collect on delivery terms, payment on shipment and countless other devices are available that will not offend the general principle that prepetition claims should not be paid.

■ On the legal side, if the claimant is bound to the debtor by contract, so long as the debtor performs post-petition, so must the claimant.[21] If the creditor is within the Court's reach and the claimant's use of its leverage violates the automatic stay, the Court may provide a remedy as effective as payment of the claim.[22]

4. Payment is the only alternative.

If the foregoing conditions are met, then payment of all or a negotiated portion of a prepetition claim will be the only alternative available to the debtor in possession. Payment will be consistent with preservation of the estate and the going concern value of the business, while not unfairly preferring one general unsecured creditor over others. Authorization of payment by the Court does no more than assist the debtor in possession in performance of its fiduciary duty.

### C. Application to the Motion

As the only evidence presented on December 20 was testimony by officers of Debtors, much of what would bear on the test the Court will apply is hearsay or speculation. Nonetheless, the Court recognizes Debtors require a disposition of the Motion to plan their business strategy during the balance of the Chapter 11 case. Accordingly, the Court, based on the pleadings and the evidence before it (no objection to any of the testimony was made during Debtors' presentation), will apply the test it has established to the seven vendors Debtors have designated as critical. .

1. Bart Construction ("Bart")

■ Bart installs grounding equipment for Debtors. Because of the quality of its services and its knowledge of Debtors' operations, Bart is necessary, according to the testimony of the Debtors' president, Mr. Chisholm, and engineering and planning vice president Falls. Mr. Falls testified that Bart is a small "Ma and Pa" concern.[23] He further testified Bart did not believe it could afford to acquire necessary goods to service Debtors if its prepetition claim were not paid. In response to questions from the Court, Mr. Falls admitted that there could be alternative economic solutions to Bart's problems such as a

---

**21.** *See* 3 COLLIER ON BANKRUPTCY ¶ 365.04[3][f] (15th ed. rev.2001); *In re Braniff Airways, Inc.*, 783 F.2d 1283, 1285–6 (5th Cir.1986); *In re Mr. Gatti's Inc.*, 164 B.R. 929, 934 (Bankr.W.D.Tex.1994).

**22.** *See, e.g., In re McLean Industries, Inc.*, 68 B.R. 690 (Bankr.S.D.N.Y.1986). The Court would reiterate that the irreplaceable supplier which uses its leverage to extort payment of a prepetition debt may violate 11 U.S.C. § 362(a)(6). It is at a minimum clear that "economic blackmail" is a most dubious ra-

tionale for invoking the Doctrine of Necessity. *See* Eisenberg & Gecker at 38; *In re Structurlite Plastics Corp.*, 86 B.R. at 932.

**23.** The Court recognizes even the temporary loss of $2,803 may be painful for a small company like Bart. However, at least absent a showing that Bart will go out of business to Debtor's detriment if its claim is not paid, Bart's needs cannot affect the Court's decision.

deposit, prepayment, or direct purchase by Debtors of the goods required. Accordingly, Debtors have failed to demonstrate that payment of Bart's prepetition claim of $2,803 is necessary. As to Bart the Motion is DENIED.

### 2. BMC

 BMC provides billing and collection services for customers of Debtors who pay by credit card. According to Debtors' chief financial officer, Mr. Clinton, though other companies provide the same services as BMC, it could take up to a month to put in place a new provider. There was no testimony that Debtors would lose receivables because of the transition; there would only be a delay in collection. Moreover, Mr. Clinton testified that someone at BMC had only warned that he (or she) "could not guarantee" that BMC would continue to service Debtors if its prepetition claim of $4,934 were not paid. There was also no evidence that Debtors discussed economic alternatives (such as a deposit) to payment of BMC's prepetition claim. Debtors have thus failed to show that they must deal with BMC, that there is any threat to estate property or a meaningful threat to Debtors' ability to operate as a going concern, or that no alternative to payment of BMC's claim is available. Accordingly, as to BMC the Motion is DENIED.

### 3. Comsource, Inc. ("Comsource")

 According to Mr. Falls, Comsource provides, at its cost, the services of a traffic engineer (Mr. Drew) who used to be employed by Debtors. Mr. Falls also testified that this individual had a unique understanding of Debtors' system. Mr.

Falls finally testified that the president of Comsource indicated he would have to reconsider his arrangement with Debtors absent payment of Comsource's prepetition claim of $21,010, which represented three months arrears.

The Court has found it difficult to reach a decision on the Comsource claim. Debtors have presented sufficient evidence to persuade the Court that Debtors very likely must deal with Comsource or risk harm to their estates or their going concern value. The peculiar nature of the relationship between Comsource and Debtors— from which Comsource derives no profit— is certainly worth preserving[24], and it is unlikely that a practical alternative to payment of the claim exists which would justify Comsource continuing that relationship. On the other hand, despite the importance of Mr. Drew's services, the Court is not satisfied that payment of the prepetition claim would be warranted absent the special terms Comsource gives Debtors. Thus, the Motion as to Comsource will be GRANTED, subject to Comsource's written undertaking to continue in exchange the existing arrangement regarding Mr. Drew with CoServe or its successors at least until the end of 2002 (unless earlier terminated by Debtors or their successors).

### 4. Minn–Tex Technologies ("MTT")

 The only evidence adduced in favor of granting the Motion as to MTT is that MTT employs consultants having expertise with Debtors' Usha software. Mr. Falls testified that he was concerned that these consultants might not be kept on the payroll by MTT if MTT's claim of $23,925 were not paid. Mr. Falls also testified,

**24.** If Comsource marked up Mr. Drew's services to account for overhead and show a profit, it is likely that Comsource could quickly recoup its claim (this is not to suggest that recoupment through an added markup is a valid self-help remedy for the ordinary creditor).

however, that MTT is not presently performing any consulting services for Debtors, though there are potential projects in prospect. None of the witnesses testified that, absent payment of its claims, MTT would refuse to do business with Debtors in the future on the basis of some form of assurance of payment.

On these facts, the Court cannot find that Debtors must deal with MTT or that if they do require its services, there is no alternative to payment of MTT's prepetition claim. As to MTT the Motion is therefore DENIED.

### 5. Terry Morris ("Morris")

Morris is described by Mr. Chisholm as "a contract employee." Morris's claim of $3,500 is thus either wages or the cost of assumption of a contract. In either event, it is payable under a legal theory other than the Doctrine of Necessity. Given the amount involved, the Court will not require that Debtors replead as to Morris. Therefore, as to Morris, the Motion will be GRANTED.

### 6. Sunbelt Telecommunications ("Sunbelt")

█ Sunbelt is one of the several entities that supply certain goods to Debtors. According to Mr. Falls Sunbelt was the one of these entities Debtors decided to designate as a "critical vendor." There being several entities other than Sunbelt from which Debtors could obtain the same supplies, the Court cannot find that Debtors must deal with it. Moreover, as multiple entities apparently compete for Debtors' business, the Court infers that Debtors can find an alternative to payment of Sunbelt's prepetition claim of $18,973 without risk to the estate or the going concern value of the business. As to Sunbelt the Motion is DENIED.

### 7. Temple, Inc. ("Temple")

█ Though Debtors owe Temple approximately $2,000,000 in prepetition invoices, they seek authority in the Motion only to pay Temple $500,000. The testimony of Mr. Falls indicates that the relationship between Debtors and Temple is complex. One of the Debtors' non-debtor affiliates may be Temple's landlord, and it could be inferred from Mr. Falls' testimony that Temple conducts other business with non-debtor affiliates of CoServe.

Temple provides warehousing to Debtors and also supplies materials, some of which have a long lead time on order. Debtors presented no evidence as to whether there was an alternative supplier to Temple, dwelling instead on the warehousing arrangement—which Mr. Chisholm suggested might be irreplaceable because of Debtors' lack of space and climate control considerations. Mr. Falls testified that Temple had indicated that the relationship with Debtors might have to be altered if the prepetition claims were not paid.

While the Court recognizes the importance of Temple, on the record made on December 20, it cannot conclude that payment of Temple's prepetition claim is necessary. Therefore, as to Temple, the Motion is DENIED.

## IV.

### *Conclusion*

In conclusion, the Court commends Debtors for their efforts to pare down their "critical vendor" list. The Court accepts that the Motion as filed represents Debtors' best efforts to deal with angry creditors anxious for payment. But with the law well-established that, absent the most extraordinary circumstances, prepetition general unsecured claims should—must—not be paid other than through a

plan; in light of the Fifth Circuit's decision in *Oxford;* and, finally, in view of Committee Counsel's suggestion that the Motion would be followed by further requests for payment of prepetition debt, this Court concludes it can go no further than it has to accommodate Debtors' request.

An appropriate Order will be entered based on this Memorandum Opinion.