**In re TEXASOIL ENTERPRISES, INC., Debtor.**

No. 02–45470–DML–7.

United States Bankruptcy Court,
N.D. Texas,
Fort Worth Division.

July 30, 2003.

Jeffrey D. Coulter, Stumpf, Craddock, Massey & Pulman, Houston, TX, for Zions First National Bank.

Josephine Garrett, Ft. Worth, TX, for Official Committee of Unsecured Creditors.

John E. Mitchell, Vinson and Elkins, LLP, Dallas, TX, for Carter Petroleum Products, Inc.

William Sterrett Parkinson, Office of the U.S. Trustee, Dallas, TX, for Official Committee of Unsecured Creditors UST U.S. Trustee.

Joseph F. Postnikoff, Goodrich, Postnikoff and Albertson, Ft. Worth, TX, for Citizens National Bank.

Joyce W. Lindauer, Joyce W. Lindauer, Attorney at Law, Arthur I. Ungerman, Arthur I. Ungerman Attorney at Law, Dallas, TX, for Texasoil Enterprises, Inc.

## MEMORANDUM OPINION AND ORDER

DENNIS MICHAEL LYNN, Bankruptcy Judge.

Before the court is the United States Trustee's ("UST") Motion to Examine

Debtor's Transactions with Attorney (the "Motion"). Arthur Ungerman ("Ungerman") has filed a response to the Motion (the "Response"). The court heard testimony on the Motion on June 17, 2003, and July 1, 2003. By agreement of Ungerman and the UST, the court will also consider the award of compensation and expenses in this case to Ungerman.[1] The court exercises core jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a) and 157(b)(1) and (b)(2)(A). This memorandum opinion constitutes the court's findings of fact and conclusions of law. *See* FED. R. BANKR.P. 7052 and 9014.

## I. Background

This case was voluntarily commenced as a chapter 11 case on July 30, 2002. Debtor retained Ungerman to represent it in the chapter 11 case, and the court approved Ungerman's employment on September 27, 2002. Debtor paid to Ungerman a retainer of $15,000 prepetition, which Ungerman still holds.

Debtor owned and operated three retail gas station/convenience stores in North Texas. Debtor had pledged all of its assets, both real and personal, to two lenders, Zions First National Bank ("Zions"), the holder of a first lien securing approximately $3,300,000 of debt, and Citizens National Bank ("CNB"), holder of a second lien securing approximately $500,000 of debt. Debtor had also accumulated substantial unsecured debt, including about $377,000 to Carter Petroleum, its principal gasoline supplier.

On motion of Carter following the adjourned first meeting of creditors,[2] the court held a status conference on October 7, 2002. Carter, the UST and other parties advised the court at the status conference that they were concerned by actions of Debtor that were inconsistent with the authority and duties of a debtor in possession, including (1) payment of prepetition debt without court authority; (2) retention of an accountant without court authority; and (3) use of cash collateral of Zions and CNB and the grant therefor by Debtor of adequate protection without court authority. After considering available options, the court determined that an order should be entered pursuant to 11 U.S.C. §§ 1107 and 1108 limiting Debtor's operating authority.[3] A copy of the resulting order (the "1107 Order") is appended hereto. The 1107 Order, *inter alia,* imposed on Ungerman certain oversight responsibilities to ensure Debtor's compliance.[4]

Following the status conference, Debtor continued to operate as a debtor-in-possession subject to the 1107 Order. Although Debtor operated at a loss at all times, several parties expressed an interest in acquiring Debtor's assets either pursuant to a plan of reorganization or through a sale under 11 U.S.C. § 363. The ultimate result of efforts to sell Debtor's assets was a plan filed by Carter.

In the meantime, Debtor apparently suffered a defalcation by one of its employees. As a result on January 6, 2003, the court directed appointment of a trustee for

---

1. Among the exhibits offered by Ungerman are his time records.

2. Creditors were not sent notice of the original date set for the meeting of creditors pursuant to 11 U.S.C. § 341.

3. The court also encouraged formation of a creditors' committee, and a committee was

formed by the UST. The committee retained Josephine Garrett ("Garrett") as counsel.

4. "Ordered that Southern District of Texas Local Bankruptcy Rule 4002 shall be applicable to Debtor, and Debtor and its counsel shall be responsible to ensure compliance with such rule." *1107 Order* at 7.

Debtor,[5] and Shawn Brown ("Brown") was appointed as chapter 11 trustee by the UST.

Carter's plan proved impracticable. On February 4, 2003, the stay was lifted on Debtor's property to allow Zions to foreclose. On March 20, 2003, Debtor's case was converted to chapter 7, and Brown was appointed as chapter 7 trustee.

On April 4, 2003, the UST filed the Motion. The Response was filed on June 12. During the hearings on the Motion, the court heard testimony from John Mitchell, counsel for Carter, Brown, Garrett and Ungerman. The parties also produced various exhibits.[6]

## II. The UST's Position

The UST asks in the Motion that the court "determine what portion of the fees paid or promised to Mr. Ungerman from any source are excessive, that it find all such fees excessive, and that it disallow Mr. Ungerman any fees for this case." The basis for this relief, the UST asserts, is Ungerman's unsatisfactory performance as counsel to the Debtor, at least until Brown's appointment as chapter 11 trust-

ee. Specifically, the UST points to Ungerman's failure to give notice of the initially scheduled (September 4) meeting of creditors;[7] the employment by Debtor of an accountant without court approval;[8] a number of errors or omissions in Debtor's schedules;[9] and the failures regarding payment of prepetition debt and use of cash collateral that led to the 1107 Order. The UST also argues that Debtor's case failed to produce a good result and that the failure was attributable in significant part to Ungerman's inadequacy. Finally, the UST takes the position that Debtor (and, therefore, Ungerman) did not properly comply with the 1107 Order.

## III. Discussion

### A. General

■ The case at bar raises the issue of the duties that must be performed by counsel for a debtor in possession. Because of the way chapter 11 of the Bankruptcy Code works, counsel for a debtor has an unusual role. In chapter 11, the norm is for a debtor to remain in control of its business and in possession of the bankruptcy estate. *Official Comm. of Unse-*

---

5. The court order for appointment of a trustee followed Zions' undertaking to compensate the trustee.

6. Though not all of the exhibits were formally offered or, thus, admitted, the court concludes that all are admissible and will consider them accordingly.

7. Ungerman was made aware of the creditors' meeting at the debtor interview on August 12, 2002. Ungerman failed to send the notice of the meeting to the creditors, despite receiving notices of appearance from several creditors. A few days before the scheduled meeting, Ungerman realized that the notice was not sent out and informed the UST of this problem. Following this, Ungerman did not inform the creditors who filed notices of appearance of this oversight, and as a result some creditors showed up for the meeting that did not occur and were inconvenienced. Ungerman claims his office made an honest

mistake that was related to the clerk's office not sending his office the notice of the meeting, a practice he had grown accustomed to in past cases.

8. Ungerman claimed at first that he was not aware that an accountant had been hired, and then that he thought the accountant was being paid for by a third party. Ungerman claimed that upon learning of the accountant's employment, he did apply to have the court approve the hiring of the accountant, which application was granted on November 14, 2002.

9. The UST alleged several oversights by Ungerman including a failure to verify any of the numbers provided to him by Debtor and the general lack of detail provided by the schedules.

*cured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 577 (3d Cir.2003); *In re Clinton Centrifuge*, 85 B.R. 980, 984 (Bankr.E.D.Pa.1988). However, a debtor, as debtor in possession, is also charged with the duties of a fiduciary, holding the estate and operating the business for the benefit of that debtor's creditors and equity owners. *Dodson v. Huff (In re Smyth, III)*, 207 F.3d 758, 761 (5th Cir.2000); *Sherr v. Winkler*, 552 F.2d 1367, 1374 (10th Cir.1977); *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr.N.D.Tex.2002).

Counsel to a debtor in possession thus serves as attorney for an accidental fiduciary: unlike a person selected to be a trustee who has a clear understanding of his fiduciary role, management of a debtor in possession is burdened with a trustee's responsibilities. It is not uncommon—especially in cases like that before the court, where management and ownership are the same—for those controlling the debtor to have interests potentially at odds with those of general creditors. For example, guaranteed corporate debt, insider loans and compensation are areas where management of a debtor and its creditors may have incompatible interests.

■ Counsel's job is to guide the debtor's management to ensure that it performs its fiduciary duties in dealing with the debtor's business and its control of the estate. While counsel to a debtor in possession may not owe a duty directly to creditors,[10] counsel does have an obligation to ensure the debtor properly maintains the estate.[11]

Debtors in possession are subject to supervision by the United States trustee. See 28 U.S.C § 586(a)(3); *In re Darmstadt Corp.*, 164 B.R. 465, 467 (D.Del.1994). Creditors' committees and even individual creditors may also police the actions of a debtor in possession. *See Advisory Comm. of Major Funding Corp. v. Sommers*, 109 F.3d 219 (5th Cir.1997). The U.S. trustee and creditor representatives, having full access to the courts (11 U.S.C. § 1109), serve as checks and balances on a chapter 11 debtor in possession.

■ In some cases, however, this typical scheme is inadequate and the debtor strays beyond the bounds set by the Bankruptcy Code and fails to meet its obligations to other parties in interest. In such cases, the Bankruptcy Code provides a range of remedies. The case may be converted to chapter 7 (11 U.S.C. § 1112), but at the cost of any going concern value that might otherwise be derived from operation of the debtor's business. The court may direct appointment of a trustee. This remedy, however, is draconian and correspondingly rare. *See* 11 U.S.C. § 1104(a); *In re Southmark Corp.*, 113 B.R. 280, 282 (Bankr.N.D.Tex.1990); 7 COLLIER ON BANKRUPTCY, 1104.02[2][b], 1104-7 (15th ed. rev.2003). Moreover, a trustee is expensive and likely to retain costly professionals. In the instant case Brown was paid $24,147.50 (by Zions by agreement) for the few weeks he operated Debtor's business.

■ Section 1104(c) of the Bankruptcy Code also allows for appointment of an examiner. While an examiner is most often an independent investigator (*see* 11 U.S.C. § 1104(c); *Southmark Corp.*, 113 B.R. at 280), the court may expand the

---

**10.** "A finding that debtor's counsel owes a particular duty to an individual creditor in a chapter 11 bankruptcy proceeding would prevent counsel from representing his client in accordance with the provisions of the Bankruptcy Code." *ICM Notes, Ltd. v. Andrews &* *Kurth, L.L.P.*, 278 B.R. 117, 126 (S.D.Tex. 2002), *affd.* 324 F.3d 768 (5th Cir.2003).

**11.** *Id.* at 124; *In re Keene Corp.*, 205 B.R. 690, 691 (Bankr.S.D.N.Y.1997).

duties of an examiner to suit the needs of the case. 11 U.S.C. § 1106(b) of the Bankruptcy Code; *Official Comm. of Unsecured Creditors of Cybergenics Corp.*, 330 F.3d at 577. An examiner, too, can be expensive, though the cost is perhaps more easily controlled by the court than in the case of a trustee.

In the case at bar, the problems brought to the court's attention at the October 7, 2002 status conference did not appear so serious as to require the intervention of a neutral examiner, and the court was concerned about incurring expenses that would prove unmanageable. Instead, therefore, the court chose to exercise its authority under section 1107. By limiting Debtor's power and authority, establishing a rigorous reporting regime and giving Ungerman a more precise role in supervising his client, the court hoped to protect the estate from future errors. As a committee was also organized, the court believed future administration of the case would be consistent with the requirements of the Bankruptcy Code.

## B. *Evaluation of Ungerman's Services*

Obviously, for the 1107 Order to serve its intended purpose, it was essential that Ungerman supervise the Debtor. The UST contends Ungerman failed to do so and has raised additional concerns about Ungerman's work prior to entry of the 1107 Order. The court must also consider Ungerman's part in the failure of Debtor's reorganization effort. The court will address these subjects in reverse order.

### 1. Failure of the Case

■ The court cannot find fault with Ungerman in Debtor's failure to reorganize. From the outset, Debtor's operations were not profitable. That meant that a successful reorganization depended upon a sale of Debtor's convenience stores. Carter became the stalking-horse buyer for those stores.

While Ungerman did not negotiate extensively with Carter, he was hardly operating in a seller's market. Nevertheless, he helped to produce two other potential buyers, and their competition caused Carter to increase its bid by almost $1,000,000. Though Carter's offers were not binding on Carter, Ungerman cannot be blamed for that. First, given Debtor's deficit operations and threatened action by secured creditors, Carter was in a very strong position. Second, Carter's good faith was evident from the time and money it expended in its effort to confirm a plan

■ As to not finding a better offer than Carter's, an attorney can only work with the facts and situation presented to him. In the instant case, the court is satisfied the value [12] of Debtor's assets was as fully explored as circumstances permitted. Success or failure of a reorganization case is only a fair measure of the value and competence of counsel if counsel can be charged with responsibility for the cause of the case's outcome. Here, no action of Ungerman caused Debtor to lose money, nor did Ungerman create the debt structure that left Zions (and, therefore, CNB) with inadequate collateral to cover its debt.

**12.** The UST complains that Debtor's schedules reflected its assets at $5,500,000, though the true value was much less. The UST argues that Ungerman should have done more to ascertain Debtor's true value. As discussed below, Debtor and Ungerman could have been more diligent and careful in preparation of Debtor's schedules and statement of affairs. The court does not find any basis, however, for concluding that Ungerman's reliance in establishing values on an old appraisal and the opinion of Debtor's principal was particularly unreasonable.

## 2. Administrative Deficiencies

Administrative deficiencies in the case at bar are more troubling. Ungerman has been practicing bankruptcy law for more than 40 years. Although his hourly rate is relatively modest, the length and breadth of his experience would suggest a performance as Debtor's counsel displaying a higher degree of ability and knowledge than he exhibited here. Though this case was not large, every chapter 11 debtor merits the full benefit of its counsel's experience and skill.

█ At the October 7th status conference and during the hearing on the Motion, Ungerman was unclear about how Debtor came to employ an accountant. It does not matter, though, whether he was unaware of employment of the accountant or thought the accountant would be paid by a third party. In either case, he should have advised his client of the need for court approval of professionals. Certainly, if he knew the accountant was to be employed, he should have recognized that, even if payment would not come from the estate, court approval was required. 11 U.S.C. § 327(a); *In re Quality Beverage Co., Inc.*, 216 B.R. 592, 594 (Bankr. S.D.Tex.1995); *In re Bicoastal Corp.*, 149 B.R. 216, 218 (Bankr.M.D.Fla.1993).

█ Payment of prepetition debt falls into the same category. Counsel to a debtor in possession must ensure the client is aware of what may be paid in the ordinary course of business and what may not be. There is no more fundamental duty of a debtor in possession to the estate than to ensure prepetition creditors are not paid absent court authority. *In re CoServ, L.L.C.*, 273 B.R. 487, 494 (Bankr.N.D.Tex. 2002); *Chiasson v. J. Louis Matherne & Assoc. (In re Oxford Mgmt.)*, 4 F.3d 1329, 1335 (5th Cir.1993). That Debtor was not so advised raises questions about Ungerman's preparation of his client to perform its fiduciary duties.

█ The same is true of Debtor's unauthorized use of case collateral.[13] A debtor should not commence a chapter 11 case—its counsel should not sign the initiating petition—without having been advised regarding the restrictions on use of cash collateral, payment of prepetition debt and employment of professionals. Even if time is so short that this advice must wait until after case commencement, in this case, Debtor spent over two months in chapter 11 without receiving this essential, rudimentary counsel.

On the other hand, the harm caused was minimal. Ultimately (with the immaterial exception of Debtor's small payments to its lenders), Ungerman obtained court approval of his client's improper conduct. Moreover, these issues were addressed at the October 7th status conference. Nevertheless, the court gives some weight to these gaps in Ungerman's services in reaching the result below.

As to problems with the schedules, certainly more time and effort could have been put into them. This is especially true given that these documents are executed under penalty of perjury. The UST points to a number of specific deficiencies,[14] but

---

13. At the October 7th status conference, Ungerman stated that he had believed a debtor and secured creditor could agree to use of cash collateral, based on an extension of adequate protection, without court approval. The court finds this explanation simply not credible.

14. During his examination of Ungerman, the UST alleged that (1) the schedules provided by Debtor and its counsel failed to identify when the claims were incurred with respect to the encumbered property, (2) Ungerman failed to verify values provided to him by the debtor with a third party and (3) Ungerman

the court does not consider that any of these rises to the level of misfeasance on Ungerman's part.

Despite a number of court decisions in individual discharge cases emphasizing the importance of accurate schedules,[15] debtors and their counsel often pay no more than pro forma attention to completion of the schedules and statement of affairs. The court is not prepared to call Ungerman to task for engaging in so prevalent a practice. The court would hope, however, that its decision in this case, like the discharge cases cited above, will encourage practitioners generally to take more seriously these important records of assets, liabilities and the debtor's past conduct.

### 3. The 1107 Order

Ungerman testified that he spent considerable time reviewing the 1107 Order with his client and discussing how to comply with it.[16] He also testified that he recognized the importance of the 1107 Order and was aware of the responsibility it imposed on him.

Nevertheless, the 1107 Order was not complied with in all respects. Weekly reports were not filed with the court as required (though Ungerman testified his client said they were). Though a tax escrow account was established, it was not used (and Debtor's monthly reports reflected that it was not used). Approval was never obtained for post petition payment of prepetition debt to Zions and CNB. Several provisions of the 1107 Order—*e.g.*, payment of costs on a current basis—were not complied with because of

the Debtor's inability to turn a profit or simply break even; Ungerman, however, took no action regarding these matters.

■■■ Indeed, while Ungerman testified that he instructed Debtor to comply with the 1107 Order, there is virtually no evidence that he thereafter monitored his client's conduct. Yet that was the very purpose of the court in naming Ungerman in the 1107 Order. The court expects any attorney representing any chapter 11 debtor to explain orders entered by the court to his client. That is no more than the attorney's job.

In a case such as the instant matter, the court found there was a need for more than what an attorney ordinarily does. The court entered the 1107 Order, having modified it to make the centrality of Ungerman's role crystal clear, in the expectation that this would cause Ungerman to supervise this Debtor with extraordinary care. The 1107 Order was meant to ensure that Debtor performed properly as a fiduciary.

It is Ungerman's failure to monitor Debtor that causes the court the greatest concern. Orders like the 1107 Order can provide the court with an attractive, inexpensive alternative to appointment of an independent fiduciary. The monitoring role of counsel involves only a little more effort than that expended in the ordinary chapter 11 case: perhaps more thorough review of reports; regular, pointed, possibly more frequent, consultation with the client. This did not occur in the instant case, despite the obvious need for it.

---

failed to include the liquor license as property of the estate in the schedules.

**15.** *See, e.g., In re Beaubouef,* 966 F.2d 174, 178 (5th Cir.1992); *In re Schmitz,* 224 B.R. 149, 151–52 (Bankr.Mont.1998); *In re Walters,* 219 B.R. 520, 526 n. 10 (Bankr.E.D.Ark. 1998).

**16.** Ungerman's time sheets disclose that approximately four hours were spent discussing the 1107 Order with Debtor. No time is reflected after October 16, 2002, dealing with the 1107 Order.

That said, had Ungerman made more of an effort to ensure Debtor's adherence to all requirements of the 1107 Order, it probably would not have affected the end result in this case. Thus, though the court must consider Ungerman's performance under the 1107 Order together with his missteps in the first two months of the case in determining the award of fees and expenses to which Ungerman is entitled, no independent sanction is warranted for Ungerman's inaction with regard to the 1107 Order.

## C. *Compensation*

Ungerman testified that he and his colleague, Joyce Lindauer, had expended substantial time in this case, and the time records presented by him at the hearing bear this out.[17] Ungerman indicated at the hearing that he had also incurred expenses in this case.

Were Ungerman seeking the approximately $25,000 that his time facially justifies, the court would never consider awarding such an amount on this record. It would not be justified under 11 U.S.C. § 330 and applicable precedent. However, only Ungerman's retainer of $15,000 is available. Even on the record before it, the court might be prepared to allow Ungerman fees in that amount but for one other factor.

In large part because of errors made by Debtor while represented by Ungerman prior to the October 7th status conference, the court and the UST went to extra lengths to obtain a creditors' committee in this case. Members of that committee may have incurred expenses, and the committee retained Garrett as counsel. Though Garrett testified at the hearing on the Motion that she accepted employment as committee counsel fully aware that she risked not being paid, it does not seem to the court equitable that Ungerman should have the full benefit (albeit not great) of the retainer, especially considering Ungerman's conduct of this case.

## IV. Conclusion

For the foregoing reasons, the court will award Ungerman $8,500 of his retainer as compensation and reimbursement of expenses. The balance of the retainer, $6,500, shall be turned over to Brown for use in payment, first, of expenses reimbursable pursuant to 11 U.S.C. § 503(b)(3)(F), and, second to be used for compensation of Garrett and any other persons allowed compensation pursuant to 11 U.S.C. § 330 by order of this court.

It is so ORDERED.

---

17. The time records show 99.5 hours. Using Ungerman's hourly rate of $250, total fees billed are $24,875.00.